STEPHEN H. LALONDE vs. VIRGINIA A. LALONDE
(and a companion case[1]).

No. 90-P-281.

Essex. November 20, 1990. - February 13, 1991.

Present: ARMSTRONG, GILLERMAN, & PORADA, JJ.

*Divorce and Separation*, Child custody, Findings. *Practice, Civil*, Findings
   by judge.

In a divorce proceeding in which legal custody of the parties' daughter was
   awarded to the husband, with physical custody to be shared jointly be-
   tween the husband and wife, the evidence, including reports of experts
   in the fields of psychology, psychiatry, and gynecology, did not require
   a finding that the husband had sexually abused the daughter, and thus
   the judge was not clearly in error in deciding that the evidence had
   failed to establish that the daughter had been sexually abused by her
   father. [120-126]
On appeal from the award of legal custody to the husband in a divorce
   proceeding in which the wife claimed that the judge was clearly wrong
   in failing to find that the husband had sexually abused their daughter,
   there was no merit to the wife's claims that the judge erred in exclud-
   ing certain additional expert testimony pertaining to child abuse, that
   the integrity of the trial was compromised by the conduct of the daugh-
   ter's attorney, or that the judge took a "consistently punitive stance
   toward the mother that disserved the interests of the child." [126-127]


COMPLAINT for divorce filed in the Essex Division of the
Probate and Family Court Department on May 24, 1983.

Complaints for custody filed on November 6, 1987, and
November 13, 1987, respectively, were heard by *Mary C.
Fitzpatrick, J.*

*David L. Kelston* (*Lowry E. Heussler* with him) for the
mother.

*George P. Lordan, Jr.*, for the child.

*Peter C. DiGangi* for the father.

[1]Virgina A. LaLonde v. Stephen H. LaLonde.

GILLERMAN, J. A judge of the Probate and Family Court, after hearing testimony from twenty-seven witnesses during a fifty-five day trial, awarded legal custody of Nicole LaLonde (child) to her father, Stephen H. LaLonde (father), with physical custody to be shared jointly between the father and the child's mother, Virginia A. LaLonde (mother). The mother has appealed, claiming principally that the judge was clearly wrong in failing to find that the father sexually abused his daughter.[2] We affirm the judgment.

1. *The Evidentiary Posture of the Case; Standard of Review.*

The child was born March 21, 1979, approximately four years after her parents were married and four years before they were divorced. The 1983 judgment of divorce nisi granted legal custody of the child jointly to her parents, and physical custody to the mother. The father was granted broad rights of visitation. In October, 1987, as a result of events described below, custody of the child was transferred by the court to the Department of Social Services (DSS), the child was placed with a foster family, and one month later the parties filed cross-complaints in the Probate Court, each parent seeking exclusive custody of the child.

On the first day of the trial in May, 1988, DSS, not having filed any petition for custody of the child, announced that it would present no witnesses. DSS left the custody of the child to be litigated by the parents and adjudicated by the court. The judge thereupon ruled in open court, and in the presence of counsel to the mother, the father, the child and DSS, that: (i) as between the parents, "it will be by fair preponderance of the evidence that they must prove they are fit for custody or that the other parent is unfit," but (ii) "if the court is to decide that neither parent is fit and [the court] is going to

---

[2]The judge's opinion included a section captioned "conclusions of law," the first of which was the following: "In a civil action, the preponderance of the evidence standard is applicable. Having reviewed and weighed the medical and non-medical evidence in this case, the conclusion that Stephen sexually abused and threatened Nicole has *not* been proved by a preponderance of the credible evidence." (Emphasis in original). It is this ruling which is the focus of the mother's appeal.

place the child with the Commonwealth, the standard would be that I must find by clear and convincing evidence that neither parent is fit, if that is going to be the outcome . . . ."

There was no objection to the judge's ruling, see Mass.R.Dom.Rel.P. 46 (1975), and the case was tried within the framework stipulated by the judge and accepted by counsel; each parent had the burden of persuasion, by a preponderance of the evidence, that the other parent was unfit (and that he or she was fit). We have a transcript of all the evidence, the judge made her findings, and the appeal, therefore, brings before us all questions of law, fact, and discretion. See *Felton* v. *Felton*, 383 Mass. 232, 239 (1981). If we are convinced that the judge's findings were clearly erroneous, (see. Mass.R.Dom.Rel.P. 52[a], as amended effective July 1, 1984) we can find facts contrary to her findings. See *Consent to Adoption of a Minor*, 363 Mass. 537, 539 (1973). However, we emphasize that here the mother does not seek to reverse a finding, such as her unfitness, as to which she was the opponent at the trial. Instead, the mother asks us to conclude that the father sexually abused the child and was therefore unfit. That is a far different matter. In order to conclude that it was clearly erroneous for the trial judge to fail to find a fact as to which the appellant was the proponent in the trial below, we must conclude that the evidence at the trial court *required* the finding in question.[3] See *Goldstein* v. *Gontarz*, 364 Mass. 800, 804 (1974) ("It is only in a 'rare' case in an exceptional situation that it can be ruled as matter of law that a proponent has met this burden [of proof]"); *Spence* v. *Gillis*, 16 Mass. App. Ct. 905 (1983); Liacos, Massachusetts Evidence 46-47 (5th ed. 1981) ("[Required] findings for proponent are given only where the facts are undisputed or indisputable, or shown by evidence by which the opponent is bound").

---

[3]The mother's brief argues that the evidence "present[s] a near impossibility that Nicole was not sexually abused."

With these preliminary observations in hand, we proceed with the mother's arguments, which we take in the order presented to us in her brief.

2. *The Evidence of Sexual Abuse.*[4]

The evidence, from which the judge drew her findings, was, so far as material to this appeal, substantially as follows. In July, 1985, the mother was told by a young friend of her child that her child had revealed an incident of sexual abuse by the father. Immediately concerned that her child was in danger, the mother began proceedings designed to terminate unsupervised visits of the child with the father and to initiate an investigation of the charges by the Family Service Office of the Essex Probate Court (FSO). The father denied the charges, but supervised visits by the child's paternal grandmother were stipulated. At the same time, the court ordered a psychological evaluation of the family, and Dr. Bruce Eissner, a psychiatrist, was selected by the FSO to do the evaluation.

Meanwhile, the mother sought additional help from the sexual information and trauma team of North Shore Children's Hospital. Interviews with the child were promptly arranged — the beginning of a stream of interrogations of the child, the judge found, "by a staggering number of people [inquiring] about the alleged incidents of abuse." Over a period of two and one-half years (during which a second allegation of sexual abuse was made by the mother based on a conversation with the child), pediatricians, pediatric gynecologists, clinical psychologists, psychiatrists, nurses, social workers, police officers, lawyers, and finally the judge herself on the last day of the trial, all sought to determine from the child's memory the truth of what happened. Beginning with the interviews with the North Shore trauma team, however, the child repeatedly swung between total retraction and steadfast affirmation of the allegations of sexual abuse.

---

[4]The mother also claimed that the judge failed to find that her child had been threatened by the father if she disclosed what had happened. In view of our conclusions we need not discuss this claim.

Dr. Eissner submitted his written report dated December 19, 1985, to the FSO. His report was in evidence, and he testified at the trial. Dr. Eissner's institutional affiliations included the Children's Hospital in Boston, Harvard University Medical School, and North Shore Children's Hospital. From psychological testing of the child (performed by Anita Mehlman, Ph.D.) and interviews of the child and both parents, Dr. Eissner came to the following conclusions: "There is no doubt that Nicole has been caught up in the maelstrom of her parents' separation, divorce, and continual disagreements. While we can find no evidence of sexual abuse or neglect, we do see signs of significant emotional stress . . . . In the absence of any evidence of sexual abuse, we suggest that it is inappropriate and even harmful for Nicole's relationship with her parents to be based on this allegation."

On January 8, 1986, the court appointed Mrs. Frances N. Goldfield as guardian ad litem and Mr. George P. Lordon, Jr., the child's attorney. After meeting with both parents and the child, Mrs. Goldfield filed an interim report dated March 25, 1986: "The complexity of this situation makes it imperative that no simplistic conclusions be drawn. Nicole is intricately involved in each parent's personal life. . . . Mrs. LaLonde is deeply concerned about her daughter . . . . Mr. LaLonde . . . denies any misconduct and is indignant at the lack of access. The ensuing struggles, litigation, evaluations, etc., are prolonging and exacerbating any harm that may have originally been done. It is necessary to go forward with a constructive plan which will protect Nicole from further emotional stress . . . ." Mrs. Goldfield recommended that the child and her father be seen in weekly therapy sessions together, and Dr. Barry Elkin, a clinical psychologist, was appointed for that purpose.

Meanwhile, in February and March of 1986, Bonnie Yasi, a social worker at DSS, was at work on a forty-five day assessment of the LaLonde family. She took detailed and careful histories from the parents and the child. With considerable insight into the complexities of the problem, she concluded, "This worker has observed Nicole with both her

parents and she has not appeared frightened in either situation. There seems to be no question, however, that Nicole is struggling under serious emotional stress. The question which remains unanswered is whether her symptoms are a result of some sexual assault or in fact are a response to feeling that the people she most cares about are engaged in a battle and she must support this or lose the love of her parents."[5]

During May, 1986, Dr. Elkin met with the child and her parents, separately and together. On May 6, when alone with Dr. Elkin, the child said that she had lied — that her father had never sexually abused her, and on May 13, she said the same thing directly to her father in the presence of Dr. Elkin. The following day the child told her mother in the presence of Dr. Elkin that she had lied about her father. However, one hour later, the mother and the child returned to Dr. Elkin; the child said she had lied about lying, that her father had sexually abused her and had threatened her.

On June 26, 1986, all the parties and their counsel were present in court, and the guardian ad litem presented her report. At the conclusion of the hearing the father was granted a three-week vacation with the child, as recommended by the guardian ad litem. The child was to call her mother each evening, and at the end of the vacation there was to be an evaluation of the experience. The child was not to be removed from the Commonwealth without the permission of the court.

Following the June 26th hearing, the mother fled the Commonwealth with her child. She returned on March 31, 1987, but her child was not with her. Probate Court judge Haskell Freedman, before whom she appeared, offered her a de novo hearing on the issue of custody upon the child's return, but she refused the suggestion, was held in contempt of court, and was sent to MCI, Framingham, until she returned the child. Again, in August, 1987, Chief Justice Warner of this court attempted to arrange the return of the child by mediat-

---

[5]An especially revealing note of Ms. Yasi is that of February 25, 1986: "DSS has concerns that the injury [to the child] is not the abuse; it's the process."

ing the controversy, but his efforts, too, failed. Finally, on October 2, 1987, the child was found and taken into custody in Durham, North Carolina. She was returned to the Commonwealth and ordered to be admitted to the Cambridge Hospital in Cambridge where the Cambridge Hospital family crisis team (the Team) and the departments of psychiatry, psychology, and pediatrics were ordered by Judge Freedman to conduct a psychological evaluation of the child and her parents. Their reports of December, 1987, and February, 1988, occupy some one hundred and ten pages of the record appendix.

The skill, care and diligence with which the Team worked is impressive.[6] Specially noteworthy is the November 23, 1987, report of Margaret Myer, the therapist who saw the child twenty-four times, mostly alone, but sometimes with her father or her mother. Ms. Myer wrote, "I cannot say for certain that Nicole was sexually abused by her father . . . . She has been traumatized by her parents' marital conflicts, divorce and custody disputes, and the more recent loss of her mother [while her mother was incarcerated]. This appears to have been more traumatic for her than the reported sexual abuse. She is primarily preoccupied with issues of abandonment, nurturance, safety, and yearns for a normal home with her mother . . . . What actually happened may never be known but decisions will have to be made without that . . . . What we might agree to is that both parents love this child. Mr. or Mrs. LaLonde are not perfect as people or as parents. Nicole loves both her parents . . . . What we *must* agree to is that all parties must find a way for Nicole to lead a normal and secure life. By all parties I mean the parents, the legal profession, the mental health and medical pro-

---

[6]Team members signing the report of December 7, 1987, were Suzanne Brennan Nathan, MSW, LICSW, Director of FACT Team, Lecturer in Psychiatry, Harvard Medical School; Elizabeth Liao, M.D., Staff Psychiatrist; John Baker, Ph.D., Staff Psychologist, Lecturer in Psychology, Harvard Medical School; Margaret Myer, MSW, LICSW, Clinical Consultant, Lecturer in Psychiatry, Harvard Medical School; Maria Sauzier, M.D., Clinical Instructor in Psychiatry, Harvard Medical School.

fessions . . . we need to look at Nicole and what is best for her."

The Team was unable to reach a clear, positive conclusion whether the father had sexually abused the child. The child "never wavered from her accusation" but, the Team wrote, that could be understood in any one of a variety of ways, and it "is impossible to determine which of these hypotheses, if any, are correct, despite the extensive evaluation . . . . " What was clear to the Team, however, was that, "[a]ny further evaluation of the sexual abuse accusation is clearly contraindicated and would place Nicole at even greater psychological risk."

The Team recommended that the child be allowed to go back to leading an anonymous, normal life as appropriate to an eight year old. She needed protection against sexualized interaction with adults because "sexual abuse had been such a focus in her life for the past two and a half years . . . ." Specifically, the Team recommended to the court that physical custody be returned to the mother, but that legal custody remain with DSS "until the . . . Team feels that mediation has progressed to a point where the parents can solve co-parenting issues on their own, without harmful effects on Nicole." The father would have visitation rights regulated by the Team; individual therapy and mediation between the parents should continue.

By February, 1988, the considerable effort of the Team to assist in the resolution of the family conflicts had largely come to naught. The Team's recommendation that the mother be given physical custody had been suspended, the mediation sessions between the parents had ended in disagreement, the Team's confidential report had been given over to a physician who, without the Team's permission, released the report to the press, and a final settlement meeting among counsel on the eve of trial had yielded no agreement. The trial began on May 2, 1988.

The professional reports described above were introduced in evidence, and various authors of the reports testified. Dr. Eissner testified that, "I do not believe that there's any evi-

dence that leads me to conclude that sexual abuse occurred in this case." Dr. Elkin testified that the mother "really believed that father had abused her daughter. When she was told by [the] daughter that [the] father hadn't abused her, she couldn't accept that, she refused to accept that, she didn't accept that."

After qualifying as an expert in child psychiatry, sexual abuse of children, and the treatment of mothers of sexually abused children, Margaret Myer testified at length, and the court gave considerable weight to her testimony. On the fifty-third day of the trial in November, 1988, she said, "I think Nicole had been hurt by Stephen LaLonde. . . . I do not think she was ever sexually abused by him." Later, Ms. Myer was questioned directly by the judge and gave her conclusions after months of working with the child. What the child wants is to live with her mother and visit freely with her father. "It's a gamble, but I — you know I can't be sure, but I think — if both parents behave and there's a court order that they behave, and the seriousness of it, I think Nicole can handle that."

Two more witnesses must be mentioned. Sarah Jean Herriott Emans, M.D., testified for the mother. Dr. Emans, like so many expert witnesses at this trial, had distinguished professional qualifications. She is the associate director of the adolescent clinic at Children's Hospital and a staff physician in the hospital's gynecology clinic. It was agreed that she qualified as an expert in pediatric and adolescent gynecology, including child sexual abuse. On cross-examination, Dr. Emans was asked whether, based on her examination of the child, she had concluded that the child had been sexually abused. Dr. Emans replied, "There isn't a 'yes' or 'no' answer to that . . . What you can say is that she had physical findings that are seen in children who have had a history of sexual abuse or have been sexually abused."

David K. Hickok, M.D., also testified for the mother. He is an assistant program director in pediatrics and the director of the child abuse evaluation and treatment center within the pediatrics department of the Southwest Michigan Area

Health Education Center; he qualified as an expert pediatrician and an expert in child sexual abuse. On August 24, 1987, when the child's whereabouts were still not known to the court, the child was taken to Kalamazoo, Michigan, to be examined by Dr. Hickok. The father then had temporary custody of the child and had not authorized or consented to the examination. On that basis the judge excluded questions regarding that examination, but permitted Dr. Hickok to testify at length using the records, findings and photographs taken by Dr. Emans. Based on the findings and records of Dr. Emans, Dr. Hickok expressed the opinion that there had been sexual abuse.

The testimony of numerous other witnesses on the issue of sexual abuse was merely cumulative. The point need not be labored further. Most certainly the psychological, psychiatric, and gynecological evidence did not require a finding of sexual abuse, and the judge was not clearly in error in deciding that the evidence had failed to establish that the child had been sexually abused by her father. See *Grandell* v. *Short*, 317 Mass. 605, 608 (1945); Mass.R. Dom.Rel.P. 52(a), as amended, effective January 2, 1987. It is equally certain that the requirement of G. L. c. 208, § 28 (requiring that a material and substantial change in circumstances be found by the court as a prerequisite to an order modifying custody arrangements following divorce) was met by proof of the events described in this opinion.

3. *Miscellaneous Claims.*

The remaining arguments of the mother do not require extended discussion. The exclusion of Dr. Hickok's examination of the child, if it was error, was clearly harmless. G. L. c. 231, § 119. Dr. Hickok was allowed to testify at length regarding the full scope of his opinion as to the sexual abuse issue. More testimony would have added still more trial days, but little further of substance. The same considerations apply to the exclusion of the testimony of Patricia McNees. She assisted at Dr. Hickok's examination of the child. She could add nothing to Dr. Hickok's testimony. The judge was well within her discretion in excluding the testimony of Dr.

Brooks and Ms. O'Connell. Neither one had ever met the child, the father or the mother.

There is no merit to the claim that the integrity of the trial was compromised by the conduct of counsel to the child. The judge, who witnessed his entire performance, expressed no criticism, nor do we.

Finally, the mother claims that the judge took a "consistently punitive stance toward the mother that disserved the interests of the child." We have reviewed the transcript and reject the claim. The judge was a model of patience, fairness, and understanding throughout the entire trial.

4. *Conclusion.*

The release of this opinion will, it is hoped, bring to an end almost five years of strife and emotional turmoil, particularly for the child. In the end, no more of the "truth" is now known than was known in the summer of 1985.

*Judgment affirmed.*