# In the Matter of Matthew Cobb.

Suffolk. September 9, 2005. - December 8, 2005.

Present: Marshall, C.J., Ireland, Spina, & Cordy, JJ.

*Board of Bar Overseers. Attorney at Law,* Disbarment. *Conversion. Constitutional Law,* Freedom of speech and press. *Rules of Professional Conduct. Due Process of Law,* Attorney disciplinary proceeding, Notice, Severity of punishment.

Substantial evidence in the record of a bar discipline case supported the finding of the board of bar overseers, as adopted by a single justice of this court, that the subject attorney converted a certain sum of his clients' share of the settlement proceeds from an action in which he represented them to pay sanctions that had been assessed to him personally. [464-466]

This court determined that in disciplinary proceedings where an attorney invokes the First Amendment to the United States Constitution when defending against charges that he impugned the integrity of a judge, without basis, during a pending case, the standard to be applied is whether the attorney had an objectively reasonable basis for making the statements in question [466-473]; consequently, the single justice in a bar discipline case did not abuse his discretion or commit an error of law by rejecting the respondent's claim of protected speech concerning allegations the respondent made against a judge, where substantial evidence supported the finding of the board of bar overseers that the respondent had no objectively reasonable basis to support those allegations [473-475].

There was no merit to any of the due process claims raised by an attorney in a bar discipline case. [475-479]

This court concluded that the sanction of disbarment imposed in a bar discipline proceeding was appropriate. [479-480]

Information filed in the Supreme Judicial Court for the county of Suffolk on March 8, 2004.

The case was heard by *Greaney,* J.

The case was submitted on briefs.

*Matthew Cobb,* pro se.

*Daniel C. Crane,* Bar Counsel, & *Jane R. Rabe,* Assistant Bar Counsel.

Spina, J. The respondent, Matthew Cobb, appeals from the judgment of a single justice disbarring him from the practice of

law for multiple violations of the Massachusetts Rules of Professional Conduct and the former Canons of Ethics and Disciplinary Rules in three cases consolidated for hearing by the Board of Bar Overseers (board).[1] In the first case, the respondent was found to have filed a motion containing improbable and false allegations that he failed to corroborate, thereby exposing his client to sanctions. He also made groundless representations to the judge. In the second case, the respondent filed a complaint against the attorneys for the adversaries of his clients alleging claims that he knew or should have known were groundless. He also misrepresented to his clients that they had been sanctioned, persisted in a frivolous appeal, converted his clients' settlement proceeds to pay sanctions assessed against him personally, and without good ground or support alleged in papers filed in the Appeals Court that the Superior Court judge who had sanctioned him had been improperly influenced and was biased. In the third case, the respondent settled a client's case without her authority. Additionally, he continued to represent her when their interests were in conflict, purportedly disclosed privileged client communications without authorization, and made misrepresentations to a judge and to bar counsel.

On appeal the respondent claims that the single justice abused his discretion or committed a clear error of law (1) by adopting unsupported findings of the board that he converted client funds; (2) by failing to rule that statements made by the respondent, even if unfounded, were protected by the First Amendment to the United States Constitution; and (3) by failing to find that the respondent's due process rights under the Fourteenth Amendment to the United States Constitution were violated where, he alleges, (a) the cases were improperly consolidated, (b) he was prejudiced by assistant bar counsel's intentional delay in bringing charges, (c) the evidence did not establish conversion as pleaded, (d) the conduct for which the respondent was prosecuted is reasonably susceptible of different interpretations, (e) assistant bar counsel prosecuted the respondent unethically

---

[1] Of the three counts considered against the respondent, two counts address conduct before 1998 and one count addresses conduct after 1998. The Massachusetts Rules of Professional Conduct took effect on January 1, 1998, and apply to conduct occurring on or after that date.

and with malice, (f) the punishment sought by assistant bar counsel was motivated by vindictiveness for the respondent's defense of the charge of conversion and for his criticism of public officials, and (g) bar discipline proceedings on their face, and statistically, invariably produce an arbitrary result. We affirm the judgment of disbarment.

1. *Facts.* We summarize the findings of fact and conclusions of law of the hearing committee that were adopted by an appeal panel of the board, and eventually by the full board itself. The single justice determined that the evidence supported these findings of fact. He also determined that the factual findings and inferences therefrom supported the board's conclusions of law, and he adopted the conclusions of law.

a. *Count one.* The respondent, who has been a member of the bar of the Commonwealth since December 20, 1990, was retained by Dr. Omar Jaraki to represent him in his claim for damages arising from his termination as an emergency room physician at Melrose-Wakefield Hospital. The respondent filed suit on Dr. Jaraki's behalf on June 11, 1993. In answers to interrogatories propounded by James Anderson of the firm Taylor, Anderson & Travers, attorney for the defendants, the respondent listed "Dr. Leo Rozenbaum" as one of Jaraki's witnesses. Anderson recognized Dr. Rozenbaum as a client of one of his partners, Attorney Ellen Epstein Cohen. By letter dated January 19, 1995, Cohen notified Dr. Rozenbaum and asked him to contact her so the firm could determine whether it was in a conflict of interest by virtue of its representations of the defendants in the Jaraki suit.

On March 3, 1995, the respondent filed an ex parte motion seeking to restrain "Attorney Diane Taylor" of the firm Taylor, Anderson & Travers, as well as another attorney who is currently a judge in the United States District Court for the District of Massachusetts and who formerly had been Dr. Rozenbaum's attorney, from "communicating by any means with Leo Rozenbaum, M.D., a witness in [this] action." The motion also sought a short order of notice and contained a prayer for preliminary injunctive relief preventing the defendants, their officers, agents, and attorneys from contacting Dr. Rozenbaum. Although the judge did not consider the motion ex parte, he issued a short

order of notice to Dr. Rozenbaum, to Dr. Rozenbaum's former attorney, and to the parties. The judge also ordered the documents impounded.

The respondent's ex parte motion falsely asserted that Attorney Taylor and Dr. Rozenbaum's former attorney were urging Dr. Rozenbaum not to testify or were attempting to influence and alter his testimony in the Jaraki matter. The respondent drafted and filed an affidavit of Dr. Jaraki in support of the motion that also contained several false allegations. He had relied entirely on the representations of his client with no attempt at corroboration. He had no good grounds to support them.

On March 4, 1995, the respondent caused a subpoena duces tecum to be served on Dr. Rozenbaum at his place of employment, requiring production of a "letter from Attorney Diane Taylor." On March 7, Attorney Cohen filed a motion to quash the subpoena on behalf of Dr. Rozenbaum. In a supporting affidavit Dr. Rozenbaum denied the allegations in the respondent's motion and stated that he had no information about the Jaraki case, that he never discussed the Jaraki case with his former attorney or with Attorney Cohen (his personal attorney), and that he did not have a letter from an "Attorney Diane Taylor," whom he did not know. Dr. Rozenbaum sought costs, attorney's fees, and other sanctions. On March 16, the defendants in the Jaraki matter filed an opposition to the respondent's motion for injunctive relief, together with a motion for sanctions. The motions were supported by the affidavit of Attorney Anderson, which stated, in part, that there was no attorney at his firm by the name of Diane Taylor. In fact, there was no Attorney Diane Taylor at the firm, a matter that was easily ascertainable.

On March 17, 1995, a hearing was held on the respondent's motion, at which Drs. Jaraki and Rozenbaum testified. At the hearing the respondent asserted that Dr. Rozenbaum, Dr. Rozenbaum's former attorney, and Attorney Diane Taylor were engaged in a criminal enterprise to prevent Dr. Rozenbaum from testifying. The judge denied the respondent's motion and found that the respondent filed the motions for injunctive relief "in bad faith and without any reasonable inquiry," in violation of Mass. R. Civ. P. 11, 365 Mass. 753 (1974). The judge ordered both the respondent and Dr. Jaraki jointly to pay sanctions in

the amount of $8,367 to the Jaraki defendants, $3,167.49 to counsel for Dr. Rozenbaum, and $1,050 to Dr. Rozenbaum.

The board adopted the conclusions of law of the hearing committee and found that the respondent's conduct in filing pleadings with the court that contained scandalous or improbable allegations without conducting an investigation into those allegations violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (5), as appearing in 382 Mass. 769 (1981) (conduct prejudicial to administration of justice); S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (6), as appearing in 382 Mass. 769 (1981) (conduct adversely reflecting on fitness to practice); S.J.C. Rule 3:07, Canon 6, DR 6-101 (A) (2), as appearing in 382 Mass. 783 (1981) (inadequate preparation); and S.J.C. Rule 3:07, Canon 6, DR 6-101 (A) (3), as appearing in 382 Mass. 783 (1981) (neglect). His continued pursuit of the claims after he received evidence that they could not be true also violated these rules.

The board determined that the respondent's conduct in asserting that Dr. Rozenbaum, Dr. Rozenbaum's former attorney, and "Attorney Diane Taylor" were engaged in a criminal conspiracy when he had no grounds to support that claim violated DR 1-102 (A) (5), DR 1-102 (A) (6), and S.J.C. Rule 3:07, Canon 7, DR 7-106 (C) (1), as appearing in 382 Mass. 787 (1981) (before tribunal, attorney shall not state or allude to any matter he had no reasonable basis to believe relevant or will not be supported by admissible evidence).

The board further found that the respondent's conduct in exposing and subjecting his client to sanctions for violation of rule 11 was a violation of S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (3), as appearing in 382 Mass. 784 (1981) (prejudice or damage to client during professional relationship).

b. *Count two.* On February 26, 1992, the respondent sent a demand letter under G. L. c. 93A on behalf of John and Jane Doe (pseudonyms) to Dr. Michael Hayes and South Shore Neurology Associates, Inc. (South Shore), alleging that Dr. Hayes had sexually assaulted Mrs. Doe during a physical examination at South Shore in December, 1990. Attorney Alan Rose, then a partner at Nutter, McClennen & Fish (Nutter), responded on behalf of Dr. Hayes and South Shore. In his letter,

Attorney Rose denied that an assault had occurred, and also wrote that the respondent's demand letter was "defamatory[, that his clients] have excellent reputations and both fully believe that your client's conduct in accusing [the doctor] of sexual and professional misconduct is actionable." Attorney Rose sent a copy of the letter to Mrs. Doe.

The respondent filed a suit against Dr. Hayes and South Shore. On November 12, 1992, he filed a complaint against Nutter and Attorney Rose that alleged the mailing of a copy of South Shore's response to his thirty-day demand letter pursuant to G. L. c. 93A (demand letter) directly to Jane Doe was a violation of the disciplinary rules that subjected Nutter and Attorney Rose to civil liability. Instead of serving the complaint, the respondent mailed a copy to Attorney Rose and invited him to discuss settlement.[2] The respondent also sent a copy of the complaint and a copy of his letter to Attorney Rose to the Does. In his letter to the Does, the respondent wrote that Nutter and Attorney Rose would become part of the lawsuit (against Dr. Hayes and South Shore) and there would be a conflict of interest between Nutter and its client, South Shore. He added that it would strengthen their case because Nutter was a "bigger law firm" and the attorneys there no longer would be able to represent Dr. Hayes and South Shore.

On December 1, 1992, the respondent served Nutter and Attorney Rose with an undated demand letter in which he referred to Dr. Hayes and South Shore as "[Nutter] and Rose's (former?) clients." By this letter the respondent was suggesting that Nutter and Attorney Rose could no longer represent their clients in light of the allegations against them in the matter. The purpose and effect of the letter was to interfere with the attorney-client relationship between Nutter and Attorney Rose on the one hand, and Dr. Hayes and South Shore on the other.

On December 4, 1992, Attorney Joseph Blute wrote to the respondent on behalf of Nutter and Attorney Rose. Citing relevant case law, Attorney Blute explained why the respondent's claims were either not actionable or barred, and he suggested

---

[2]The complaint was dismissed without prejudice on March 16, 1993, for lack of prosecution pursuant to the Superior Court Standing Order 1-88 on Time Standards.

that the respondent refrain from suing Nutter and Attorney Rose because it would violate the respondent's obligations under rule 11 and the disciplinary rules, and would constitute grounds for costs and attorney's fees under G. L. c. 231, § 6F. Attorney Blute repeated his position in a second letter dated December 23. The respondent wrote to Attorney Blute on January 7, 1993, asserting that he does "not care whether it's Nutter, F. Lee Bailey or a kid right out of law school, NOBODY is going to do to my clients what [Nutter] attempted and get away with" it. On January 8, Attorney Blute telephoned the respondent and attempted to persuade him against pursuing the complaint against Nutter and Attorney Rose. The respondent angrily told Attorney Blute that he would not allow "large firms" to treat him this way. Attorney Blute suggested that the board, and not a civil suit, was the appropriate forum. The respondent did not report Nutter or Attorney Rose to the board.

On December 17, 1993, the respondent filed a new complaint on the Does' behalf against Nutter, Attorney Rose, Dr. Hayes, and South Shore in which he alleged that mailing a copy of the response to the demand letter directly to Jane Doe violated G. L. c. 93A and the Massachusetts Civil Rights Act, invaded the Does' privacy, and intentionally inflicted emotional distress on them. Nutter and Attorney Rose filed a motion to dismiss alleging several grounds, including absolute privilege, together with a motion for attorney's fees under rule 11 and G. L. c. 231, § 6F. On February 2, 1994, a judge in the Superior Court (motion judge) conducted a hearing on the motion to dismiss. She dismissed the complaint against Nutter and Attorney Rose, concluding that Attorney Rose's actions were "clearly privileged" and that the "mailing of the 93A reply directly to the plaintiff was not actionable." On August 12, 1994, she conducted a hearing on the motion for sanctions and found that the complaint filed by the respondent was "patently lacking in any even arguable merit," that the respondent had received the relevant legal research from Attorney Blute "demonstrating that lack of any viable cause of action," and that the respondent had "pursued the action for the apparent purpose of depriving South Shore [and Dr. Hayes] of its chosen counsel." The motion judge found that the respondent had violated rule 11, and she awarded

attorney's fees of $4,000, specifying that the fees "be paid by [the respondent] and not, directly or indirectly, passed on to the [Does]." The respondent did not provide a copy of the decision to the Does, and he misrepresented to the Does that it was they who were sanctioned in the amount of $4,000. When John Doe told the respondent he could not afford to pay the sanction, the respondent offered to "split" the sanction with the Does and asked them for $2,000 because he intended to appeal from the decisions. He told Doe he would win the appeal and they would get their money back. John Doe paid the respondent $2,000.

On September 29, 1994, the respondent filed a petition for interlocutory review and a motion for a stay of the order for sanctions. In his affidavit in support of interlocutory review, the respondent alleged that Nutter "must have some particular power or influence with the trial court judge" for the judge to overlook Nutter's ethical breaches. A single justice of the Appeals Court denied the petition, and he awarded Nutter and Attorney Rose additional attorney's fees of $3,244.50 and double costs for the respondent's conduct in filing a "scandalous," "impertinent," and "frivolous" petition that is "devoid of any rational or supportable basis in fact or law, to the extent it accuses the judge of bias, unethical conduct, and inappropriate susceptibility to unspecified illegitimate influence of the lawyer respondents."

On April 28, 1995, a different Superior Court judge (judgment judge) ordered entry of separate and final judgment on behalf of Nutter and Attorney Rose. He ordered the respondent to pay the $4,000 sanction, and erroneously ordered the Does to pay the $3,244.50 sanction (the sanction ordered by the Appeals Court single justice). The order was received by the respondent after Doe had paid him the $2,000 he requested. On June 5, 1995, the respondent filed a notice of appeal from the separate and final judgment. Also in June, 1995, the respondent settled the complaint against Dr. Hayes for $45,000. In his accounting of the settlement proceeds, the respondent credited the Does with their $2,000 payment for the sanctions ordered by the motion judge, but he deducted from their portion of the proceeds $3,244.50, plus $227.11 interest for the sanctions imposed by the single justice of the Appeals Court. He told the Does that he

had lost before the single justice and that additional sanctions were ordered. He said he would pay the first sanction (ordered by the motion judge), but that they would have to pay the sanction ordered by the single justice. The Does agreed to this arrangement because they thought they were responsible for the full amount of both sanctions.

In September, 1995, the respondent filed a brief on appeal from the entry of separate and final judgment of dismissal and the orders for sanctions. He charged the Does for work done on this appeal. On August 16, 1996, the Appeals Court affirmed the orders of the motion judge and its single justice. The court stated, "[W]e affirm the judgment dismissing the complaint and the orders of the motion judge *and the single justice's assessing sanctions against plaintiffs' counsel.* We also consider this appeal frivolous and award double costs against the *plaintiffs' counsel.*" (Emphasis added.) *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 144 (1996). The respondent filed an application for further appellate review that was denied. 423 Mass. 1111 (1996). If there had been any doubt as a result of the order for separate and final judgment that the respondent was solely liable for all sanctions, it became clear by August, 1996, when the Appeals Court issued its decision, that the respondent alone was responsible for the sanctions.

The board adopted the conclusions of law of the hearing committee and found that the respondent's conduct in filing suit against Nutter and Attorney Rose when he knew or should have known that the claim was unwarranted under existing law and when there was no good faith basis for pursuing the claim constituted a violation of rule 11; DR 1-102 (A) (5); DR 1-102 (A) (6); and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (2), as appearing in 382 Mass. 785 (1981) (knowingly advancing claim or defense unwarranted under existing law). The board said that although the ethical propriety under S.J.C. Rule 3:07, Canon 7, DR 7-104 (A) (1), as appearing in 382 Mass. 786 (1981) (communicating on subject of representation with party known to be represented), of Attorney Rose sending a copy of his response to the respondent's demand letter directly to Jane Doe was not clearly established when the respondent filed the claim, it was clear that a violation of a disciplinary rule did

not establish a basis for civil liability. See *Fishman* v. *Brooks*, 396 Mass. 643, 649 (1986).

The board found that the respondent's conduct in alleging in pleadings filed in the Appeals Court that the motion judge had been influenced improperly in dismissing the complaint and in imposing sanctions on him when he had no good ground to support such accusations was a violation of rule 11; DR 1-102 (A) (5); DR 1-102 (A) (6); and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (1), as appearing in 382 Mass. 785 (1981) (lawyer shall not take action on behalf of client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another). The board concluded that the respondent's conduct in persisting in a frivolous appeal from the dismissal and sanctions imposed against him by the motion judge, the single justice, and the Appeals Court violated DR 1-102 (A) (5), DR 1-102 (A) (6), and DR 7-102 (A) (2).

The board determined that the respondent's conduct in misrepresenting to his clients that sanctions had been assessed against them instead of telling them that he had been sanctioned personally was a violation of S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), as appearing in 382 Mass. 769 (1981) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102 (A) (5); DR 1-102 (A) (6); and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (1), as appearing in 382 Mass. 784 (1981) (intentional failure to seek lawful objectives of client); S.J.C. Rule 3:07, Canon 7, DR 7-101 (A) (2), as appearing in 382 Mass. 784 (1981) (intentional failure to carry out contract of employment); and DR 7-101 (A) (3).

The board further found that the respondent's conduct in converting $3,471.61 of the clients' share of the settlement proceeds to pay sanctions that had been assessed to him personally violated DR 1-102 (A) (4); DR 1-102 (A) (5); S.J.C. Rule 3:07, Canon 9, DR 9-102 (B) (3), as appearing in 419 Mass. 1303 (1995) (failing to maintain complete records of handling, maintenance, and disposition of all trust funds and render appropriate accounts); and S.J.C. Rule 3:07, Canon 9, DR 9-102 (B) (4), as appearing in 419 Mass. 1303 (1995) (failing promptly to pay funds to clients as requested by clients or otherwise due).

c. *Count three.* On November 1, 1995, Marie Malave retained the respondent to represent her in an action against Carney Hospital for alleged discrimination on the basis of disability, race, and ethnicity. They executed a contingent fee agreement on the subject. On December 19, 1995, the respondent filed Malave's complaint with the Massachusetts Commission Against Discrimination (MCAD) and with the Equal Employment Opportunity Commission (EEOC). The MCAD complaint was dismissed as untimely. The respondent subsequently filed suit against the hospital and a supervisor in the United States District Court for the District of Massachusetts under the Americans with Disabilities Act and Title VII of the Federal Civil Rights Act.

In February, 1998, the respondent represented to counsel for the defendants and to the judge that Malave would accept $30,000 to settle all her claims against the defendants. On March 11, 1998, during a break in Malave's deposition, counsel for the defendants told the respondent that his clients would not settle for $30,000, but that he would recommend settling for $15,000. The respondent conveyed the offer to Malave, who telephoned the respondent's office the next day and left a message on his answering machine informing him that she would not settle for less than $30,000. On March 16, Malave repeated her decision to the respondent directly over the telephone.

On March 18, 1998, the respondent telephoned counsel for the defendants and made a demand of $15,000 to settle the case. That same day the respondent telephoned Malave and tried to convince her to settle for $15,000, but she refused to settle for that amount. The respondent telephoned counsel for the defendants later that day to confirm the $15,000 settlement. Malave telephoned her son in Atlanta, Georgia, and asked him to contact the respondent and tell him to stop trying to force her to settle for $15,000. Malave's son left a detailed message with a woman who answered the telephone at the respondent's law office. The respondent never returned the telephone call to Malave's son. On March 24, 1998, Malave engaged Attorney Robert Hernandez to assist her. On March 25, Attorney Hernandez telephoned the respondent, who said that as far as he was concerned the case was settled for $15,000 in accordance with the authority Malave had given him.

On April 1, 1998, the respondent advised counsel for the defendants that Malave was refusing to honor the settlement agreement. Counsel for the defendants filed a motion to enforce the settlement agreement and to dismiss Malave's complaint with prejudice. Unbeknownst to Malave, the respondent filed a verified response to the motion, verified only by the respondent, in which he represented that Malave had authorized the settlement and that he was "ready to submit to the Court in camera currently privileged documents and testimony indicating that a settlement was reached with Malave's full consent and authority." The respondent had no authority to disclose privileged documents or to pursue enforcement of the putative settlement. Malave never signed any document indicating that she consented to or authorized a $15,000 settlement.

On May 14, 1998, the defendants' motion to enforce the settlement was allowed, without an evidentiary hearing. On June 28, 1998, Attorney Hernandez, on behalf of Malave, appealed from the order to the United States Court of Appeals for the First Circuit. The Court of Appeals vacated the order and remanded the case for an evidentiary hearing on whether the respondent had actual authority from Malave to settle her case. See *Malave* v. *Carney Hosp.*, 170 F.3d 217 (1st Cir. 1999). On September 14, 1999, the District Court judge conducted an evidentiary hearing. The respondent failed to produce any documents at the evidentiary hearing indicating he had authority to settle the case on Malave's behalf. The judge found that there was nothing in the record to indicate affirmatively that Malave had given the respondent the authority to settle her case, and that the respondent lacked actual authority to settle the case. The judge reinstated Malave's case.

The board found that the respondent's conduct in failing to advise opposing counsel that his client did not wish to settle for $15,000 violated Mass. R. Prof. C. 1.2, 426 Mass. 1310 (1998) (lawyer shall seek lawful objectives of client). His conduct in continuing to represent Malave when his personal and professional interests were in conflict with her interests, in failing to withdraw when he knew or it became apparent that his interests conflicted with hers, and in purporting to represent the client by filing a plaintiff's verified response that conflicted with his

client's interests were determined by the board to violate Mass. R. Prof. C. 1.2; Mass. R. Prof. C. 1.7 (b), 426 Mass. 1330 (1998) (lawyer will not represent client if representation may be materially limited by lawyer's responsibility to another or by lawyer's own interests); Mass. R. Prof. C. 1.8 (b), 426 Mass. 1338 (1998) (lawyer shall not use confidential information to disadvantage of client or for lawyer's advantage unless client consents after consultation); and Mass. R. Prof. C. 1.16 (a) (1), 426 Mass. 1369 (1998) (lawyer shall withdraw if representation will result in violation of rules of professional conduct).

The board further found that the respondent's conduct in purporting to disclose client communications to the judge and opposing counsel without his client's authorization and against his client's interests violated Mass. R. Prof. C. 1.6 (a), 426 Mass. 1322 (1998), and Mass. R. Prof. C. 1.8 (b). The respondent's conduct in falsely representing in pleadings filed with the court that he had documents and testimony demonstrating that his client had authorized settlement for $15,000 violated Mass. R. Prof. C. 3.3 (a) (1), 426 Mass. 1383 (1998) (knowingly making false statement of material fact or law to tribunal); Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998) (dishonesty, fraud, deceit, or misrepresentation); Mass. R. Prof. C. 8.4 (d), 426 Mass. 1429 (1998) (conduct prejudicial to administration of justice); and Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998) (conduct adversely reflecting on fitness to practice law).

2. *Sufficiency of the evidence of conversion.* The respondent argues that the single justice erred by concluding that the evidence supports the board's finding that he converted $3,471.61 of the Does' share of the settlement proceeds to pay sanctions that had been assessed to him personally. He contends that there was no evidence to support this finding. When reviewing the subsidiary findings of the board in a bar discipline case, we inquire whether the findings are supported by substantial evidence. See *Matter of Segal,* 430 Mass. 359, 364 (1999); S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1311 (1997) (subsidiary findings shall be upheld if supported by substantial evidence).

There is substantial evidence in the record to support a finding of conversion. First, the order of August 12, 1994, required

the respondent to pay the $4,000 sanction, and it specifically directed the respondent not to pass the payment on to the Does. John Doe testified that the respondent told him and his wife that they had been sanctioned in the amount of $4,000. The hearing committee credited this testimony, as well as Doe's testimony that the respondent offered to "split" this sanction with the Does and asked for $2,000 (which they paid him on April 28, 1995), because he intended to appeal from the decision. The hearing committee further credited Doe's testimony that the respondent told the Does that they would be responsible for the $3,244.50 sanction imposed by the single justice. This testimony was corroborated in part by the respondent's June 23, 1995, corrected settlement statement, which showed a credit of $2,000 to the Does for sanctions imposed by the motion judge, and a deduction of $3,244.50 for sanctions assessed against them by the single justice, together with $227.11 interest thereon. The respondent offered a different scenario in his testimony, but the hearing committee was entitled to credit Doe's testimony and discredit the respondent's testimony on this point. The hearing committee is "the sole judge of the credibility of the testimony presented at the hearing." *Matter of Saab*, 406 Mass. 315, 328 (1989), quoting S.J.C. Rule 4:01, § 8 (3), as appearing in 381 Mass. 784 (1980). Thus, there is substantial evidence that the respondent temporarily misappropriated or converted $2,000 of the Does' money by misrepresenting the details of the motion judge's order to them.

Second, the respondent has converted $3,471.61 of the Does' property by misrepresenting to them that they were sanctioned by the single justice of the Appeals Court, when it was he who was sanctioned. Although the single justice did not specify who was to pay the $3,244.50 sanction, a point the respondent relies on for his contention that the order was unclear as to whether it was directed at him or his clients, it is obvious from the nature of the proceedings that the sanction was directed at him. The petition for interlocutory relief concerned the dismissal of the action under G. L. c. 93A action against Nutter and Attorney Rose that arose out of the conduct of litigation about which the respondent, and not his clients, possessed knowledge. It was the respondent's conduct that produced the dismissal of that portion

of the action and the resulting order of sanctions for $4,000 that was directed at him specifically. In his order denying interlocutory relief, the single justice concluded that the petition for interlocutory relief was not only "frivolous," but also "scandalous and impertinent," "devoid of any rational or supportable basis in fact or law, to the extent it accuses the judge of bias, unethical conduct, and inappropriate susceptibility to unspecified illegitimate influence of the lawyer respondents." He was referring, of course, not to anything the Does had initiated or done, but to the manner in which the respondent was conducting the litigation. His contention that the single justice's order was unclear is disingenuous.

Moreover, in the background portion of its opinion in *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 140 (1996), the Appeals Court stated unequivocally that "the single justice . . . imposed sanctions . . . *against plaintiffs' counsel* for his scandalous and impertinent remarks [in the petition for interlocutory appellate review] in which he accused the Superior Court judge of bias, unethical conduct, and inappropriate susceptibility to influence by [Nutter] and [Attorney] Rose" (emphasis added). In its discussion of the sanctions imposed by the single justice, the Appeals Court again stated "[t]he plaintiffs argue that the single justice erred in imposing sanctions . . . *against their counsel*" based on the above-described remarks inserted in the petition for interlocutory appellate review (emphasis added). *Id.* at 143. By August 16, 1996, the date the Appeals Court decided *Doe* v. *Nutter, McClennen & Fish, supra*, there could be absolutely no doubt that the sanction imposed by the single justice of the Appeals Court was levied against the respondent, and his failure to reimburse the Does for the use of their share of the settlement proceeds to pay a sanction owed by him alone constitutes a conversion of their funds. He still has not repaid his clients.

The single justice did not abuse his discretion or commit a clear error of law by adopting the findings of the board that the respondent converted client funds.

3. *Protected speech.* The respondent contends that two statements he made concerning the motion judge and Dr. Rozenbaum's former attorney (now a United States District Court

judge), for which he has been sanctioned, involve public speech on matters of the highest public concern, namely, corruption by public officials, and as such constitute protected speech under the First Amendment. He argues that the First Amendment prohibits the Commonwealth from relying on those statements as the basis for punishment or discipline absent a showing by bar counsel that the statements presented a clear and present danger to the administration of justice.

The respondent's reliance on *Bridges* v. *California*, 314 U.S. 252 (1941), is misplaced. The question in that case was whether the court's contempt power may be used to punish the media for statements made outside the court room that tend to interfere with the fair and orderly administration of justice in a pending case. His reliance on *Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829 (1978), is similarly unavailing. That case involved a State statute that made it a crime to divulge information regarding confidential proceedings of a State judicial review commission even if the person divulging the information (Landmark published the information in a newspaper) is a stranger to the proceedings and even if the published information is truthful. The present case is not concerned with the rights of the media in matters of public debate. Rather, this case concerns the power of a State to regulate the speech of an attorney representing clients in pending cases.

The Supreme Court has said that "[i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed . . . . Even outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, [360 U.S. 622 (1959),][3] observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary

---

[3]*In re Sawyer*, 360 U.S. 622 (1959), involved review of an order of the Supreme Court of Hawaii suspending for one year an attorney's license to practice law based on her public statements made outside the courtroom in which she allegedly impugned the impartiality and fairness of a judge who was presiding over a pending trial in which the attorney was actively involved. The Court reversed the order of suspension on the ground that the evidence was insufficient to support the charges. *Id.* at 631-635. Justice Stewart, who provided the fifth vote for reversal, wrote a concurring opinion in which he expressed his agreement as to the sufficiency of the evidence, but disagreed with the intimation in Justice Brennan's plurality opinion that the attorney's

citizen would not be." *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1071 (1991). The Court went on to say that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of" other kinds of speech protected by the First Amendment. *Id.* at 1074.

Statements by an attorney critical of a judge in a pending case in which the attorney is engaged are especially disfavored. In *Bradley* v. *Fisher*, 80 U.S. (13 Wall.) 335, 355 (1871), the Court said that attorneys are under an implied "obligation . . . to maintain at all times the respect due to courts of justice and judicial officers. This obligation . . . includes abstaining *out of court* from all insulting language and offensive conduct toward judges personally for their judicial acts" (emphasis added). There can be no question that statements by an attorney critical of a judge are afforded no greater protection when made in the court room. Cf. *Gentile* v. *State Bar of Nev.*, *supra* at 1071. More recently, as noted above, the Supreme Court quoted with approval the dissenting opinion of the four Justices in *In re Sawyer*, *supra*, who would have affirmed the sanction: "Of course, a lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice. But a lawyer actively participating in a trial . . . is not merely a person and not even merely a lawyer. . . . He is an intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *Gentile* v. *State Bar of Nev.*, *supra* at 1072, quoting *In re Sawyer*, *supra* at 666, 668 (Frankfurter, J., dissenting). The Supreme Court decisions in the *Bradley*, *Sawyer*, and *Gentile* cases did not distinguish between true and false criticism, founded and unfounded criticism. Unfounded criticism, which concerns us here, is certainly more offensive, and it comes within the holdings in those cases, which do not require application of the clear and present danger test.

We turn to the question of the standard to be applied in

statements would have been protected by the First Amendment. *Id.* at 646-647. Justice Frankfurter dissented, joined by three other Justices, and said that not only was the evidence sufficient to support the charges, but the attorney's statements were not protected by the First Amendment. *Id.* at 668, 669.

disciplinary proceedings where an attorney invokes the First Amendment protection of free speech when defending against charges that he impugned the integrity of a judge, without basis, during a pending case. The Supreme Court has not decided this precise question. At least three States have said that disciplining an attorney for criticizing a judge is analogous to a defamation action by a public official for the purposes of First Amendment analysis. They apply the "actual malice" or subjective knowledge standard of *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-281 (1964), to such proceedings. See *Matter of Green*, 11 P.3d 1078, 1084 (Colo. 2000); *Oklahoma Bar Ass'n* v. *Porter*, 766 P.2d 958, 969 (Okla. 1988) (statements made immediately after proceedings had ended); *Ramsey* v. *Board of Professional Responsibility*, 771 S.W.2d 116, 121-122 (Tenn.), cert. denied, 493 U.S. 917 (1989). California also may apply the "actual malice" test, although it is unclear. See *Ramirez* v. *State Bar of Cal.*, 28 Cal. 3d 402 (1980).

A majority of State courts that have considered the question have concluded that the standard is whether the attorney had an objectively reasonable basis for making the statements. Generally, these cases involve the application of the equivalent of current Mass. R. Prof. C. 8.2, 426 Mass. 1428 (1997),[4] or the former Massachusetts Canons of Ethics and Disciplinary Rules, S.J.C. Rule 3:07, Canon 8, DR 8-102 (B),[5] 382 Mass. 794 (1981), the rule in effect at the time the respondent made his statements. See note 1, *supra*. See, e.g., *Florida Bar* v. *Ray*, 797 So. 2d 556 (Fla. 2001), cert. denied, 535 U.S. 930 (2002) (rule 8.2); *Idaho State Bar* v. *Topp*, 129 Idaho 414 (1996), cert. denied, 520 U.S. 1155 (1997) (rule 8.2); *Matter of Terry*, 271 Ind. 499 (1979), cert. denied sub nom. *Terry* v. *Indiana Supreme Court Disciplinary Comm'n*, 444 U.S. 1077 (1980) (DR 8-102 [B]); *Matter of Frerichs*, 238 N.W.2d 764 (Iowa 1976) (DR

---

[4]Rule 8.2 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1428 (1998), states: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge or a magistrate, or of a candidate for appointment to judicial or legal office."

[5]Supreme Judicial Court Rule 3:07, Canon 8, DR 8-102 (B), 382 Mass. 794 (1981), states: "A lawyer shall not knowingly make false allegations against a judge or other adjudicatory officer."

8-102 [B]); *Kentucky Bar Ass'n* v. *Waller*, 929 S.W.2d 181 (Ky. 1996), cert. denied, 519 U.S. 1111 (1997) (rule 8.2); *State Bar Ass'n* v. *Karst*, 428 So. 2d 406 (La. 1983) (DR 8-102 [B], but no First Amendment claim); *In re Graham*, 453 N.W.2d 313 (Minn.), cert. denied sub nom. *Graham* v. *Wernz*, 498 U.S. 820 (1990) (rule 8.2); *Matter of Westfall*, 808 S.W.2d 829 (Mo.), cert. denied, 502 U.S. 1009 (1991) (rule 8.2); *Matter of Holtzman*, 78 N.Y.2d 184, 190, 192, cert. denied, 502 U.S. 1009 (1991), citing *In re Huffman*, 289 Or. 515, 522 (1980) (charges were brought under equivalent of DR 1-102 [A] [5], [6], alleging conduct "prejudicial to the administration of justice" or "that adversely reflects on his fitness to practice law," with no mention of DR 8-102 [B]; court held that conduct "was properly the subject of disciplinary action under DR 1-102 [A] [5], [6], and it is of no consequence that [the petitioner] might be charged with violating DR 8-102 [B] based on this same course of conduct"); *Office of Disciplinary Counsel* v. *Gardner*, 99 Ohio St. 3d 416 (2003), cert. denied, 540 U.S. 1220 (2004) (DR 8-102 [B]). See also *United States Dist. Court for the E. Dist. of Wash.* v. *Sandlin*, 12 F.3d 861 (9th Cir. 1993) (rule 8.2). All but four of these cases specifically declined to apply the "actual malice" or subjective knowledge test required in defamation cases by *New York Times Co.* v. *Sullivan, supra.*[6]

The majority view, which rejects the applicability of the "actual malice" or subjective knowledge test of *New York Times Co.* v. *Sullivan, supra*, is best expressed by reasoning from two cases. The first is *Matter of Terry, supra* at 502-503, where the court said:

"The Respondent is charged with professional miscon-

[6]*Kentucky Bar Ass'n* v. *Waller*, 929 S.W.2d 181 (Ky. 1996), cert. denied, 519 U.S. 1111 (1997), addressed a general First Amendment claim that was not focused on the standard required in defamation cases by *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-281 (1964). *State Bar Ass'n* v. *Karst*, 428 So. 2d 406 (La. 1983), did not address the First Amendment at all. *Matter of Terry*, 271 Ind. 499 (1970), cert. denied sub nom. *Terry* v. *Indiana Supreme Court Disciplinary Comm'n*, 444 U.S. 1077 (1980), while not specifically referring to *New York Times Co.* v. *Sullivan, supra*, rejected the petitioner's First Amendment claim as one based on "cases sounding in libel and slander." *Matter of Terry, supra* at 502. *Matter of Frerichs*, 238 N.W.2d 764, 770 (Iowa 1976), rejected a subjective interest test.

duct, not defamation. The societal interests protected by these two bodies of law are not identical. Defamation is a wrong directed against an individual and the remedy is a personal redress of this wrong. On the other hand, the Code of Professional Responsibility encompasses a much broader spectrum of protection. Professional misconduct, although it may directly affect an individual, is not punished for the benefit of the affected person; the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations . . . . Unwarranted public suggestion by an attorney that a judicial officer is motivated by criminal purposes and considerations does nothing but weaken and erode the public's confidence in an impartial adjudicatory process."

The second case is *In re Graham, supra* at 322, where the court said:

"This court certifies attorneys for practice to protect the public and the administration of justice. That certification implies that the individual admitted to practice law exhibits a sound capacity for judgment. Where an attorney criticizes the bench and bar, the issue is not simply whether the criticized individual has been harmed, but rather whether the criticism impugning the integrity of judge or legal officer adversely affects the administration of justice and adversely reflects on the accuser's capacity for sound judgment. An attorney who makes critical statements regarding judges and legal officers with reckless disregard as to their truth or falsity and who brings frivolous actions against members of the bench and bar exhibits a lack of judgment that conflicts with his or her position as 'an officer of the legal system and a public citizen having special responsibility for the quality of justice.' Minn. R. Prof. Conduct, Preamble."

We agree with the reasoning in these cases.

We also agree with the Court of Appeals of New York, where it said in *Matter of Holtzman, supra* at 192, that "[a]ccepting petitioner's argument [as to the applicability of the 'actual malice' or subjective knowledge standard] would immunize all

accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth." A system that permits an attorney without objective basis to challenge the integrity, and thereby the authority, of a judge presiding over a case elevates brazen and irresponsible conduct above competence and diligence, hallmarks of professional conduct. See S.J.C. Rule 3:07, Canon 6, DR 6-101, as appearing in 382 Mass. 783 (1981); Mass. R. Prof. C. 1.1, 426 Mass. 1308 (1998); Mass. R. Prof. C. 1.3, 426 Mass. 1313 (1998).

Judges are not above criticism or immune from review of their court room conduct. See, e.g., *Commonwealth* v. *Sylvester*, 388 Mass. 749, 750-752 (1983); *Matter of Troy*, 364 Mass. 15 (1973). Under the objective knowledge standard, an attorney does not lose his right to free speech. He may make statements critical of a judge in a pending case in which the attorney is a participant. He may even be mistaken. What is required by the rules of professional conduct is that he have a reasonable factual basis for making such statements before he makes them. See *Office of Disciplinary Counsel* v. *Gardner, supra* at 423.

This requirement may be inconsistent with the manner in which one generally may engage in free and public debate in our society, but it is essential to the orderly and judicious presentation of cases in a court room. "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California*, 314 U.S. 252, 271 (1941). Decisions made in the forum of public debate, unlike those made in the court room, are not constrained by principles of due process and the rule of law, or by the application of logic and common sense to objective facts dispassionately determined from competent and relevant evidence. When an attorney speaks in a court room, he is not seeking political converts whose vote properly may be cast without regard to motive or basis. Rather, he seeks to persuade an impartial judicial officer to direct the force of government against a particular third person. If the judicial system is to operate fairly, rationally, and impartially, as it must, and if the administration of justice is to proceed in an orderly manner, judges and attorneys alike must act with responsibility toward

these principles. Attorneys must conduct themselves conformably with the legal and ethical requirements that their factual assertions in the court room that are critical of judges have an objective basis. See *Office of Disciplinary Counsel* v. *Gardner, supra* at 423. The court room is not a place for groundless assertions, whatever their nature. The State's interest in protecting the public, the administration of justice, and the legal profession supports use of an objective knowledge standard in attorney discipline proceedings involving criticism of judges in pending cases. See *In re Graham, supra* at 322.

We turn to the particulars of the speech in question and review the record to determine whether there is substantial evidence to support the finding that the respondent had no good ground to support his allegation as to the motion judge (DR 1-102 [A] [5], [6], and DR 7-102 [A] [1]). With respect to the allegations concerning the attorney who has become a United States District Court judge, we inquire whether there is substantial evidence to support the finding that the respondent had no reasonable basis to believe that his statements about her would be supported by admissible evidence (DR 1-102 [A] [5], [6], and DR 7-106 [C] [1]). Although these rules do not use the precise terms, we conclude that they require attorneys to have an objectively reasonable basis for allegations made in court.

The respondent asserts that the facts in the Doe matter permitted a "reasonable inference of bias [on the part of the motion judge], because . . . a judge is absolutely required to act when she is made aware of unethical conduct." We need not belabor this point because it has been decided by the Appeals Court in *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 143-144 (1996). The alleged unethical conduct to which he refers consists of Attorney Rose sending a copy of his response to the respondent's demand letter directly to the respondent's client, Jane Doe. Even if such conduct violated the rules of professional conduct, a point we need not decide, it is not itself actionable. See *Fishman* v. *Brooks*, 396 Mass. 643, 649 (1986). As this conduct was the basis of claims against Nutter and Attorney Rose, the claims were properly dismissed. Not only had the respondent been apprised of the state of the law on this point before proceeding with the lawsuit, but he also was advised in

advance, correctly, that the proper forum for a private party to raise an allegation of unethical conduct such as the one he was advancing is the board, not a court. See *Slotnick* v. *Pike*, 374 Mass. 822 (1977). The respondent chose to ignore this advice and proceeded instead to advance a groundless lawsuit, in violation of rule 11. His criticism of the motion judge as biased, based on her disposition of his case, was groundless. It violated DR 1-102 (A) (5), DR 1-102 (A) (6), and DR 7-102 (A) (1). See *Matter of Holtzman*, 78 N.Y.2d 184, 192 (1991), citing *In re Huffman*, 289 Or. 515, 522 (1980).

There is no merit to the respondent's assertion that the other basis for alleging bias on the part of the judge is her alleged failure to disclose to him that Attorney Blute had engineered, ex parte, a change in the assignment of the judge originally assigned to the case, and that Attorney Blute admitted as much at the hearing before the hearing panel. The hearing committee rejected these assertions and found to the contrary. The panel found that one Superior Court judge, who originally was assigned to the Doe matter, recused himself because he had been a partner at Nutter before becoming a judge. The case thereafter was reassigned. There is no evidence of any impropriety by the judge to whom the case was reassigned, and the need for reassignment of the case because of the potential conflict for both is obvious and unremarkable. The respondent voiced no objection when the motion judge to whom the case was reassigned appeared on February 2, 1994, to preside over the hearing. Moreover, the transcript of that hearing indicates that she was patient, respectful, and courteous, that she conducted a thorough hearing, and that she gave the respondent every opportunity fully to argue his motion.

The respondent's assertion in the Jaraki matter that Dr. Rozenbaum, Dr. Rozenbaum's former attorney, and Attorney Diane Taylor were engaged in a criminal conspiracy to prevent Dr. Rozenbaum from testifying was based entirely on the affidavit of Dr. Jaraki, which had been prepared by the respondent. Dr. Jaraki's assertions, in turn, purportedly were based on statements of Dr. Rozenbaum, which, in his affidavit, Dr. Rozenbaum denied making. In his testimony at the hearing on Dr. Jaraki's motion for a preliminary injunction, Dr. Rozenbaum

again denied making the statements attributed to him by the respondent. The respondent was also advised that there was no Attorney Diane Taylor, a fact that was easily verifiable. Having absolutely no evidence to support his claim of criminal conspiracy, and possessing only inadmissible hearsay from Dr. Jaraki in an affidavit, the respondent pressed his criminal conspiracy theory and thereby violated DR 7-106 (C) (1), as well as DR 1-102 (A) (5) and (A) (6). The single justice did not abuse his discretion or commit an error of law by rejecting the respondent's claim of protected speech and adopting the findings and conclusions of the board with respect to his statements.

Finally, the respondent contends that the single justice committed a manifest error of law and otherwise abused his discretion by ignoring the respondent's "right to, as an officer of the court, report — without fear of penalty therefor[ ] — under his safe harbor responsibility the prima facie unethical doings of Judges in ongoing court proceedings." The "safe harbor responsibility" of which he speaks is not a responsibility, but a provision in a court rule concerning extrajudicial statements by attorneys. The respondent's reliance on *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1048-1049 (1981), for the existence of a "safe harbor" for otherwise improper speech by attorneys is misguided, for two reasons. First, that case involved Rule 177 of the Nevada Supreme Court Rules, which has no application to Massachusetts; and second, the safe harbor principle applies only to extrajudicial statements, not to statements made by attorneys in court.[7] Contrary to the respondent's claim, there is no safe harbor provision in the attorney's oath set forth in G. L. c. 221, § 38. The single justice properly rejected the respondent's safe harbor claim.

4. *Due process claims.*

a. *Consolidation.* There is no merit to the claim that the consolidation of the cases to establish a "pattern" of misconduct violated the respondent's due process rights. We have said that

---

[7]Rule 3.6 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1392 (1998), concerning trial publicity, contains a safe harbor provision for certain extrajudicial statements. It did not exist at the time the respondent's statements were made, and in any event would not have been applicable because his statements were made in court, and because his statements impugned the integrity of a judge, without any objectively reasonable basis.

severance of cases would defeat the purpose of bar discipline, which is to determine an attorney's fitness to practice law based on the "total picture" of his professional conduct. See *Matter of Saab*, 406 Mass. 315, 322 n.10 (1989). In that case we rejected a similar due process claim, and the respondent offers no reason to persuade us that his claim is appreciably different or more compelling as to require a different result. *Id.* at 322-325.

b. *Delay*. The respondent contends that he was prejudiced by delay in the disciplinary proceedings because it rendered Dr. Jaraki, who moved out of State, unavailable. He also claims that the first two cases are too old (the petition for discipline was filed on February 12, 2001).

The appeal panel correctly rejected this argument because the respondent did not properly argue the issue to the hearing committee, but only baldly asserted that Dr. Jaraki was unavailable and that the delays were per se unconstitutional. See Rule 3.51(a)(1)(iv) of the Rules of the Board of Bar Overseers (2005) ("briefs on appeal shall contain . . . [t]he argument in support of the appeal with appropriate references to the record and legal authorities"). The claim lacks merit, in any event. Mere delay does not require dismissal of the proceedings, see *Matter of London*, 427 Mass. 477, 481 (1998), and the respondent has failed to establish that he was prejudiced by the delay.

The respondent received a subpoena for Dr. Jaraki, and if Dr. Jaraki were not subject to service of the subpoena because he moved out of State, the respondent could have taken his deposition. See Rules 4.9(a), 4.11 of the Rules of the Board of Bar Overseers (2005). The record includes both Dr. Jaraki's affidavit and the transcript of his testimony at the hearing on his motion for a preliminary injunction on March 17, 1995, in the Superior Court where he was questioned about his affidavit. They were considered by both the hearing committee and the board. In addition, Dr. Rozenbaum's former attorney testified that she never spoke to Dr. Rozenbaum in 1995, and Attorney Ellen Epstein Cohen testified that she never told Dr. Rozenbaum not to testify in the Jaraki matter and that she did not know Dr. Rozenbaum's former attorney. The record also includes the transcript of Dr. Rozenbaum's testimony at the March 17, 1995, hearing. The allegations against the respondent

were corroborated by sources other than Dr. Jaraki. See *Matter of Gross*, 435 Mass. 445, 451 (2001).

c. *Variance*. The respondent contends that his due process rights were violated because the evidence on which his discipline rests as to conversion of the Does' money is at variance with the allegations. Dismissal on the grounds of variance between the allegations and the proof is not required if the charges have been correctly specified, unless the respondent is thereby prejudiced in his defense. Cf. *Commonwealth* v. *Grasso*, 375 Mass. 138, 139 (1978).

This claim was not made before the hearing committee or the board, and is deemed waived. See *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 347 (1996). However, even if it had been preserved, it is meritless. The petition for discipline alleges "the respondent intentionally misrepresented to the [Does] that they had been sanctioned in the amount of $4,000, [and] offered to 'split' the sanctions with [them]," and that he thereby violated DR 1-102 (A) (4), (5), and (6) and DR 7-101 (A) (1), (2), and (3). The petition further alleges that "the respondent misrepresented to his clients that [further] sanctions had been assessed against them in the amount of $3,244.50 plus $227.11 in interest [and that he] deducted $3,471.11 from the [Does'] share of the settlement and used these funds to pay the sanctions imposed against him personally," thereby "converting [their] share of the settlement proceeds to pay sanctions assessed against him personally," and in violation of DR 1-102 (A) (4), (5), and (6) and DR 9-102 (B) (3) and (4). These allegations fairly put him on notice of the charge of conversion and the basis therefor. See *Matter of Abbott*, 437 Mass. 384, 392 (2002).

Assistant bar counsel modified her theory of conversion in response to the respondent's evidence. For example, she claimed error by the judgment judge who ordered entry of judgment (his only contact with the case) for payment of the $3,244.50 sanction to be made by the Does. What is important is that the essence of the charge did not change. The respondent's due process rights were not violated, and he has shown no prejudice. See *Matter of Saab*, *supra* at 324-325.

d. *Notice*. The respondent contends that he may not properly

be punished for bringing an allegedly unwarranted claim against Nutter and Attorney Rose based on the motion judge's ruling that Attorney Rose's response to the respondent's demand letter was privileged, see *Sriberg* v. *Raymond*, 370 Mass. 105 (1976), because reasonable judges have reached different conclusions about whether a letter such as that written by Attorney Rose is privileged. He relies on *Meltzer* v. *Grant*, 193 F. Supp. 2d 373 (D. Mass. 2002), where, he claims, a United States District Court magistrate reached a different conclusion. We disagree.

The respondent had argued in the Superior Court that Attorney Rose's letter could provide the basis for a civil action because the letter was not privileged. He argued that it was not privileged because it did not *in good faith* threaten a lawsuit. He reasoned that because his own demand letter was absolutely privileged under *Sriberg* v. *Raymond, supra*, it could not provide a good faith basis for a defamation action as Attorney Rose had intimated in his response. Because Attorney Rose lacked a good faith basis to sue for defamation, the mention of defamation in his letter could not be privileged. The motion judge rejected this argument, as did the Appeals Court. See *Doe* v. *Nutter, McClennen & Fish, supra* at 140-141, quoting *Sriberg* v. *Raymond, supra* at 109 ("the privilege . . . attaches to statements made by an attorney 'in the institution or conduct of litigation *or in conferences and other communications preliminary to litigation*' " [emphasis added]). The "litigation" privilege does not benefit only potential plaintiffs in G. L. c. 93A cases, and the Federal magistrate judge recognized this. See *Meltzer* v. *Grant, supra* at 379, discussing *Doe* v. *Nutter, McClennen & Fish, supra*. The *Meltzer* case does not support the respondent's claim. Moreover, the respondent ignores the significant factual difference between the two cases.

e. *Prosecutorial misconduct.* The respondent claims that his due process rights were violated by the prosecutorial misconduct of assistant bar counsel. His claims are conclusory and unsupported by the record. There is no evidence, as he claims, that assistant bar counsel "intentionally tricked" and "economically coerced" the Does into signing on to her accusation of conversion of client funds. The testimony of John Doe, but especially the documentary evidence and the transcript of the hearing on

February 2, 1994, when the motion judge indicated she would impose sanctions on the respondent and not the Does, contradict the respondent's baseless claim.

f. *Vindictiveness*. There is utterly no support for the respondent's claim that assistant bar counsel vindictively sought to punish him for "report[ing] highly questionable acts of two popular judges." Moreover, it is waived because it was not argued before the hearing committee. *Sugarman* v. *Board of Registration in Med., supra.*

g. *Arbitrariness*. The respondent alleges that "the entire Lawyer Discipline . . . System in Massachusetts . . . cannot produce anything other than an arbitrary result." The issue was first presented to the appeal panel as nothing more than a bald assertion and was properly rejected because it was not properly argued in his brief. See Rule 3.51(A)(1)(iv) of the Rules of the Board of Bar Overseers. We likewise reject the claim.

The single justice did not abuse his discretion, nor did he commit a clear error of law, by rejecting the respondent's due process claims or by adopting the findings and rulings of the board.

5. *Appropriateness of sanction*. When reviewing a sanction imposed by the single justice we inquire whether it is markedly disparate from judgments in comparable cases. *Matter of Alter*, 389 Mass. 153, 156 (1983). In applying this standard it is appropriate to consider the "cumulative effect of the several violations committed by the respondent." *Matter of Tobin*, 417 Mass. 81, 88 (1994), quoting *Matter of Palmer*, 413 Mass. 33, 38 (1992). The presumptive sanction for conversion or misappropriation of client funds is disbarment or indefinite suspension. See *Matter of Schoepfer*, 426 Mass. 183, 186 (1997). That presumption in this case "is bolstered by the seriousness of [the respondent's] additional misconduct," and by the existence of several aggravating factors. See *Matter of Bailey*, 439 Mass. 134, 151-152 (2003); *Matter of Finn*, 433 Mass. 418, 424 (2001); *Matter of Saab, supra* at 328.

Other misconduct of the respondent that warrants suspension includes groundless and scandalous accusations of misconduct against judges and opposing counsel, previously discussed. The respondent also made misrepresentations to the court about his

authority to settle Malave's case and about documents he claimed would establish his authority. See *Matter of Neitlich*, 413 Mass. 416 (1992) (one-year suspension). This is not an exhaustive summary.

In aggravation, the hearing committee and the board found that, at the time of his misconduct, the respondent had substantial experience in the practice of law. See *Matter of Luongo*, 416 Mass. 308, 312 (1993). He has failed to acknowledge the nature, effects, and implication of his misconduct. See *Matter of Clooney*, 403 Mass. 654, 657-658 (1988). He continues to lack insight into his behavior and persists in blaming everyone except himself. He has made unfounded allegations in these proceedings against the hearing committee for failing to provide subpoenas and for engaging in ex parte communications with bar counsel, unfounded allegations that closely resemble the conduct alleged in the petition for discipline and found as fact. In addition, Marie Malave was a vulnerable client, an immigrant of limited means whose first language was not English and who was the sole source of support for her children. There were no facts found in mitigation other than circumstances deemed "typical," which would not affect the sanction. See *Matter of Alter, supra* at 157.

The respondent has demonstrated rather convincingly by his quick and ready disparagement of judges, his disdain for his fellow attorneys, and his lack of concern for and betrayal of his clients that he is utterly unfit to practice law. The only appropriate sanction is disbarment.

The judgment of the single justice is affirmed.

*So ordered.*