MURIEL SUGARMAN *vs.* BOARD OF REGISTRATION IN
MEDICINE.

Suffolk. January 11, 1996. - March 28, 1996.

Present: LIACOS, C.J., ABRAMS, LYNCH, O'CONNOR, & FRIED, JJ.

*Board of Registration in Medicine. Administrative Law,* Administrative mat-
ter, Agency's authority, Judicial review, Failure to raise issue before
agency. *Privacy. Doctor,* License to practice medicine.

The Board of Registration in Medicine has authority to discipline a psychi-
atrist for conduct which undermines public confidence in the integrity of
the medical profession. [342-343]

Evidence that a forensic psychiatrist publicly disclosed psychiatric and
medical information received under a court order of confidentiality,
without an examination of the patient and without the patient's consent,
for the admitted purpose of influencing judicial determination of the
matter, was substantial evidence that supported the decision of the
Board of Registration in Medicine to discipline the psychiatrist for
engaging in conduct which undermined public confidence in the integ-
rity of the medical profession. [343-346]

This court declined to consider on appeal an argument not raised before an
administrative magistrate and not adequately raised before the Board of
Registration in Medicine. [347]

This court deferred to the expertise of the Board of Registration in Medicine
in its determination of the proper sanction for misconduct of a physi-
cian. [347-348]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on October 31, 1994.

The case was reported by *Nolan,* J.

*Charles P. Reidy* (*Mary T. Gibbons* with him) for the
plaintiff.

*Karen J. Laufer,* Assistant Attorney General, for the defen-
dant.

ABRAMS, J. A single justice of this court reserved and
reported the issues raised by the appeal of the plaintiff, Dr.
Muriel Sugarman, from a decision of the Board of Registra-
tion in Medicine (board). The board determined that Sugar-

man's conduct in releasing confidential information to the press undermined public confidence in the integrity of the medical profession and therefore Sugarman was subject to professional discipline. The board imposed sanctions. See *infra* at 342. Sugarman appealed. We affirm the decision of the board.

Sugarman is a psychiatrist specializing in adult and child psychiatry but is not board certified in either specialty. She was retained as an expert witness in a highly publicized and acrimonious custody dispute in the Essex Probate and Family Court involving allegations of sexual abuse of a minor child by her father. The child's mother strongly opposed any unsupervised visitation between the child and the father, while the father denied all allegations of sexual abuse.[1] Both a guardian ad litem and an attorney were appointed to represent the child's interests.

With the consent of the guardian ad litem, unsupervised visitation between the child and her father was ordered on June 26, 1986, to commence on June 27, 1986. Rather than allow this visitation, the mother fled the Commonwealth with the child. Temporary custody was awarded to the father. The mother returned in March, 1987, without the child, and was jailed for contempt of court. She remained jailed until the child was located in October, 1987, and returned to Massachusetts. The child then was admitted to Cambridge Hospital for a court-ordered evaluation by the hospital's psychiatry, psychology, and pediatrics departments (Family Crisis or FACT team), which was to issue a report to the court (Cambridge report). During the period of the mother's incarceration and the child's evaluation at Cambridge Hospital, the allegations of sexual abuse were highly publicized in the news media. The Probate Court judge, on September 18, 1987, issued a protective order requiring that the parties, attorneys, Dr. Dennis Harrison,[2] and "all other known and potential expert witnesses . . . cease forthwith

---

[1]An Essex Probate and Family Court judge determined in June, 1989, after a lengthy trial, that the mother had not proved by a preponderance of credible evidence that the father sexually abused the child or was in any way unfit as a parent. The judge awarded legal custody of the child to the father and shared physical custody of the child to the parents. The Appeals Court affirmed. See *LaLonde* v. *LaLonde*, 30 Mass. App. Ct. 117 (1991).

[2]An expert retained by the mother.

from making public extrajudicial oral or written statements or both concerning this case or releasing (tapes) material including but not limited to [the child's] medical history and records, [and] psychiatric and psychological history or treatment."[3] In October, 1987, a more specific order prohibiting disclosure of the contents of the Cambridge report was entered (the gag order). It required the mother's attorney, as a condition of receiving a copy of the report, to sign a statement which provided that she "accept[ed] a copy of the Report with a clear understanding that [she would] discuss the contents with [her] client only and such expert medical personnel as [she] may engage and counsel, the parties and such expert medical personnel are not to discuss nor disclose the contents of the Report with anyone else." The Cambridge report, received by the parties in December, 1987, contained psychiatric evaluations of the father, the mother, and the child, psychological reports on the parents, physical findings from the child's pelvic examination and the child's treatment records. The authors of the Cambridge report specifically concluded that further media publicity was not in the child's best interest.

In December, 1987, the attorney for the mother forwarded a copy of the Cambridge report to Sugarman, who had been retained by that attorney to act as an expert witness and consultant. The attorney informed Sugarman of the court's gag order and that the attorney would be subject to a charge of contempt of court if Sugarman discussed or disclosed the contents of the report with anyone.

Sugarman believed that the child was at an unreasonable risk of harm if the court allowed unsupervised visitation between the child and the father and that she had a moral duty to protect the child from the risk of further abuse by her father.[4] Therefore, despite the judge's prohibition, Sugarman showed selected portions of the Cambridge report to Steve Curwood, a reporter for the Boston Globe newspaper, allowed him to take notes, and gave him permission to publish

[3]The entire file of the custody matter had been impounded by a judge of the Essex Probate and Family Court in January, 1986.

[4]Sugarman further justifies her actions by reporting that she felt that the guardian ad litem and the child's attorney would not be receptive to her concerns because they previously had recommended unsupervised visitation and were closely aligned with the father.

selected information contained in the report.[5] Neither the child, her parents, nor the attorney authorized Sugarman to disclose the information in the Cambridge report or to speak with Curwood.[6] Curwood's article was published in the Boston Globe on December 30, 1987, and included detailed quotes from the Cambridge report. On that same date, Sugarman held a press conference in which she identified herself as an "advocate" and a "child psychiatric expert consultant on the issue of sexual abuse" and in which she asserted that the "evaluation report from the sexual abuse team at The Cambridge Hospital, which I have studied in depth, contains ample psychological and physical evidence to indicate that [the child] *was* sexually abused by her father . . . on at least three, but possibly more, occasions."[7] Sugarman went on to describe several other statements made in the report or by members of the evaluation team and then to criticize the report and state her belief that the treatment decisions being made for the child placed her at grave risk for further serious psychological damage and repeated sexual abuse.[8] Sugarman acknowledged that she called the press conference at "some personal and professional risk."

As a result of Sugarman's actions, a contempt hearing was conducted in the Essex Probate and Family Court to determine whether the mother's attorney could be held in contempt for violation of the gag order. On February 24,

---

[5]Curwood previously had published numerous articles concerning the case, including an article on December 19, 1987, in which he reported that the FACT team was "unable to reach conclusive findings after more than two months of evaluating the child and her parents." Sugarman contends that she spoke to Curwood on December 28, 1987, in order to clarify his December 19 article.

[6]Prior to releasing the information to Curwood, Sugarman did not personally examine or interview any member of the family, nor did she speak to anyone who directly examined or interviewed any member of the family.

[7]The board's findings of fact report that Sugarman stated that the Cambridge report contained ample evidence that the child was sexually abused by her father on at least one, but possibly three, occasions. This discrepancy is immaterial to our decision.

[8]When Sugarman was deposed by the father in a civil suit arising out of the disclosures, she stated that she disclosed the evaluation to the media because she believed that the resulting publicity would have more impact on the Probate Court's decision-making than any testimony she might offer in the custody hearing.

1993, the board issued a statement of allegations that Sugarman had engaged in conduct which undermined public confidence in the integrity of the medical profession by knowingly disregarding the express warning of the FACT team that publicity would be detrimental to the child, by deliberately defying the gag order intended to prevent disclosure of the Cambridge report by the parties and their experts, and by undermining the fair and orderly administration of justice.[9]

A hearing was held before an administrative magistrate of the Division of Administrative Law Appeals who, in her proposed findings of fact and conclusions of law, recommended that Sugarman be disciplined for engaging in conduct which undermined public confidence in the integrity of the medical profession on two separate occasions (the leak to Curwood and the press conference). On September 28, 1994, the board issued its final decision and order in which it determined that Sugarman did indeed engage in conduct which undermined public confidence in the integrity of the medical profession. The board ordered indefinite suspension of Sugarman's license, which suspension would be permanently stayed on payment of a $10,000 fine and approval of Sugarman's plan to perform one hundred hours of community service.

1. *The board's authority.* Sugarman asserts that the board lacks authority to discipline her because she did not engage in any wrongdoing. Therefore, Sugarman asserts that the board cannot discipline her for her actions. We do not agree. The board has broad authority to regulate the conduct of the medical profession, see *Kvitka* v. *Board of Registration in Medicine*, 407 Mass. 140, cert. denied, 498 U.S. 823 (1990), which authority includes its ability to sanction physicians for conduct which undermines public confidence in the integrity of the medical profession. *Raymond* v. *Board of Registration in Medicine*, 387 Mass. 708, 713 (1982) (board has authority to discipline physicians for conduct that undermines public

---

[9]Complaint counsel further charged that Sugarman committed gross misconduct or misconduct in the practice of medicine in violation of G. L. c. 112, § 5 (c), and 243 Code Mass. Regs. § 1.03 (5) (a) (3) and (18) (1993). The administrative magistrate found that Sugarman did not violate these sections because her misconduct did not occur in the context of a physician-patient relationship. Accordingly, she was not disciplined under these sections.

confidence in the integrity of the profession; reasonably related to promotion of the public health, welfare, and safety).

Conduct which undermines public confidence in the integrity of the medical profession is an independently sufficient ground for the board to sanction a physician. Such conduct is not limited to that outlined in G. L. c. 112, § 5 (1994 ed.). The board has broad authority to "protect the image of the medical profession" and is not limited to disciplining conduct involving direct patient care, criminal activity, or deceit. *Id.*

Sugarman's actions violated the family's privacy interests, her ethical obligations as a forensic psychiatrist,[10] and her duties to the Probate Court, the attorney who hired her, and the family. Sugarman was on notice that the evaluation was confidential. Prior to the press conference, the mother's attorney specifically forbade Sugarman from proceeding and warned her that, as the attorney who gave the report to Sugarman, the attorney would be at risk of contempt if Sugarman so proceeded. Sugarman also was aware of the FACT team's conclusion that additional publicity was not in the child's best interests.

Sugarman was, or should have been, aware of the Ethical Guidelines for the Practice of Forensic Psychiatry (AAPL Guidelines) promulgated by the American Academy of Psychiatry and the Law (AAPL) in May, 1987,[11] and the Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry (1986) promulgated by the American Psychiatric Association (Principles of Medical Ethics). As she was engaged in the practice of forensic psychiatry in this case, Sugarman's lack of membership in the AAPL is immaterial. The guidelines as they apply to this case do no more

---

[10]Sugarman's contention that she was not acting as a forensic psychiatrist in this matter is without merit. Forensic psychiatry is defined in the commentary to the preamble of the Ethical Guidelines for the Practice of Forensic Psychiatry (rev. 1989) (AAPL guidelines) as "a subspecialty of psychiatry in which scientific and clinical expertise is applied to legal issues in legal contexts." One cannot find a more apt definition of Sugarman's role in the custody litigation.

[11]The copy of the AAPL guidelines in the record contains revisions made in 1989. The record does not include a copy of the guidelines as they existed in December, 1987. However, no evidence was submitted from which the board or this court could conclude that the guidelines in effect in 1987 contained any material differences or that reliance on those guidelines would materially alter our analysis.

than state what are the evident obligations of an ethical medical professional receiving confidences and acting in circumstances such as these. The violation of the guidelines is no more than a particular example of conduct which undermines public confidence in the integrity of the medical profession over which the Board has authority.

The AAPL guidelines clearly and specifically prohibit the disclosure of confidential psychiatric and medical information obtained by the physician because of her professional position as a forensic psychiatrist. Section II of the AAPL guidelines provides that "[r]espect for the individual's right of privacy and the maintenance of confidentiality are major concerns of the psychiatrist performing forensic evaluations," and that "information or reports derived from the forensic evaluation are subject to the rules of confidentiality as apply to the evaluation and any disclosure is restricted accordingly." The commentary to the AAPL guidelines further warns that "[t]he psychiatrist should take precautions to assure that none of the confidential information he receives falls into the hands of unauthorized persons." Here, through the judge's order, a rule of strict confidentiality applied to the Cambridge report. Sugarman violated this confidentiality by allowing Curwood access to the Cambridge report and by revealing its contents at her press conference.

The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry also forbid the disclosure of confidential patient information without the patient's consent.[12] Section 4 of the Principles provides that "[a] physician shall respect the rights of patients . . . and shall safeguard patient confidences within the constraints of the law." Because, as Sugarman concedes, she had no legal obligation to hold the press conference and disclose the confidential information bearing on the father's alleged sexual abuse of the child, Sugarman had an ethical obligation under the Principles of Medical Ethics to maintain confidentiality.

Sugarman also violated her ethical obligation to maintain

---

[12]We, like the board, reject Sugarman's argument that the Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry (1986) apply only in the context of physician-patient relationships. The principles by their terms recognize that psychiatrists may have obligations with regard to persons who are not their patients. See, e.g., § 7 of the Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry (1986), discussed infra.

objectivity and honesty in the profession. The commentary to § IV of the ethical guidelines, Honesty and Striving for Objectivity, is illustrative. It cautions against rendering opinions without a personal examination and imposes on a psychiatrist the responsibility, when rendering a public opinion, clearly to indicate that there was no personal examination and that the opinion expressed is thereby limited. The commentary further provides that "[t]he impression that a psychiatrist in a forensic situation might distort his opinion in the service of the party which retained him is especially detrimental to the profession and must be assiduously avoided." The annotation to § 7 of the Principles of Medical Ethics echoes this sentiment. It states that "[o]n occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention, or who has disclosed information about himself/herself through public media. *It is unethical for a psychiatrist to offer a professional opinion unless he/she has conducted an examination and has been granted proper authorization for such a statement*" (emphasis added). Sugarman's conduct violated the express provisions of these annotations.[13] Sugarman was neither honest about her limited role nor did she maintain objectivity. Her credibility, and the credibility of the psychiatric profession, were further compromised because Sugarman had not spoken with any member of the FACT team and did not so indicate in her public statements. As the commentary recognizes, this kind of conduct is especially detrimental to the profession. It is a valid basis for discipline.[14]

Sugarman's contention that her actions should not be sanctioned because the information she released had previously been released to the public is unsupported by the evidence. The record indicates that the details of the Cambridge

[13]Sugarman's argument that her actions were justified by the threat of imminent danger to the child is belied by the facts. First, Sugarman states in her brief that she believed that unsupervised visitation would not commence for at least two months. Second, because Sugarman was not the child's physician, she had no right or legal duty to act on the child's behalf in contradiction of the wishes of the child's guardian ad litem, attorney, and the Probate Court judge, all of whom had the legal duty to protect the child.

[14]Sugarman's motivation for the disclosure is not relevant. See *Keigan v. Board of Registration in Medicine*, 399 Mass. 719, 722-723 (1987) (physician's motivation to help drug addicted patients by prescribing controlled substances does not render board's disciplinary action arbitrary or capricious or abuse of discretion).

report had not previously been released. The article appearing in the Boston Globe on December 19, 1987, merely stated that the results of the Cambridge report were inconclusive and that the report was confidential. It did not reveal detailed information or quotes from the Cambridge report. Additionally, the timing of Sugarman's release of information, during the pendency of the custody dispute, and her admitted intent to influence the outcome of the proceedings, render the disclosure particularly unprofessional. We agree with the board that Sugarman's attempt to influence the judicial process through publication of a highly confidential and sensitive document "has always been improper, ethical guidelines notwithstanding."

Sugarman admitted in the press conference that her conduct placed her at some personal and professional risk. She knowingly and publicly deviated from acceptable professional and ethical standards and disclosed confidential information with the awareness that others more closely associated with the child disapproved of her decision. She was aware that the authors of the Cambridge report, trained professionals who personally examined and interviewed all members of the family, considered any additional publicity to be contrary to the child's best interests.

Sugarman inflated her role in the litigation and her obligations to the child when she arrogated to herself the right to decide whether to release confidential information. Sugarman suggests that, in spite of the board's view of a physician's professional and ethical standards, this court should read the ethical guidelines as leaving it to a nontreating psychiatrist's "judgment and discretion" to determine when disclosure of confidential information is justified. We decline to do so.

Sugarman's argument that the board's decision to sanction her is not supported by substantial evidence is without merit. What we have said about the board's authority disposes of this argument.[15]

---

[15]Sugarman's contention that the board should be required to demonstrate through an opinion poll that the public has actually lost confidence in the medical profession as a result of her conduct is without merit and was rejected by this court in *Aronoff* v. *Board of Registration in Medicine,* 420 Mass. 830 (1995) (court rejects argument that absent proof of actual harm to patient from transaction board lacks authority to impose sanctions).

2. *Sugarman's First Amendment claim.* Sugarman argues that the board lacks authority to discipline her because her actions are protected by the First Amendment to the United States Constitution. This argument was not raised before the administrative magistrate and was not adequately raised before the board. Sugarman's entire constitutional argument before the board consisted of a one-page conclusory statement in which she asserted that the magistrate's findings were not supported by substantial evidence because her statements did not reveal confidential information about a patient and were protected by the United States Constitution. The argument contained no citation to authority. Sugarman made no argument that the board's disciplinary authority was an unreasonable restriction on her First Amendment right or that the board's general authority to discipline a physician for conduct which undermines public confidence in the medical profession is unconstitutionally vague or overbroad. She cannot raise these arguments for the first time on appeal. See *Kagan* v. *Levenson,* 334 Mass. 100, 106 (1956) ("The theory of law on which by assent a case is tried cannot be disregarded when the case comes before an appellate court for review of the acts of the trial judge"). This principle holds equally true when dealing with an appeal from an administrative agency decision. See *Fragopoulos* v. *Rent Control Bd. of Cambridge,* 408 Mass. 302, 306 n.4 (1990) ("Because the plaintiff had every opportunity to present relevant evidence regarding his petition to the hearing officer, and did not do so, we decline to hear this objection").[16]

3. *Sanctions imposed.* Sugarman argues that the penalty is excessive. The board has broad discretion to determine the proper sanctions for misconduct by physicians. See *Kvitka* v. *Board of Registration in Medicine,* 407 Mass. 140, 143 (1990). We defer to the board's expertise in making that determination. *Aronoff* v. *Board of Registration in Medicine,* 420 Mass. 830, 834 (1995). "It is 'well-settled that in reviewing the

---

[16]We point out that in *In re Sawyer,* 360 U.S. 622, 646-647 (1959), the concurring opinion of Mr. Justice Stewart addresses and rejects Sugarman's First Amendment argument: "Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech. For example, I doubt that a physician who broadcast the confidential disclosures of his patients could rely on the constitutional right of free speech to protect him from professional discipline."

penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh.' " *Levy* v. *Board of Registration in Medicine*, 378 Mass. 519, 529 (1979), quoting *Shakin* v. *Medical Examiners*, 254 Cal. App. 2d 102, 112-113 (1967), appeal dismissed and cert. denied, 390 U.S. 410 (1968). The board's final decision and order are affirmed.

*So ordered.*