463 Mass. 605 (2012)                                                605

Schoeller v. Board of Registration of Funeral Directors and Embalmers.

TROY J. SCHOELLER vs. BOARD OF REGISTRATION OF FUNERAL
DIRECTORS AND EMBALMERS.

Suffolk. January 6, 2012. - October 26, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Board of Registration in Embalming and Funeral Directing. Constitutional Law,* Freedom of speech and press, Regulation. *Due Process of Law,* Vagueness of regulation. *Administrative Law,* Agency's interpretation of regulation. *Regulation.*

Discussion of the standard of review of a facial challenge to a regulation on grounds of unconstitutional vagueness and overbreadth. [611-612]

This court concluded that a regulation of the board of registration of funeral directors and embalmers (board), 239 Code Mass. Regs. § 3.13(7) (1998), which prohibits an embalmer or funeral director from commenting on the condition of any dead human body entrusted to his or her care, was on its face unconstitutionally overbroad, where the board's generalized interest in maintaining the integrity of the profession could not outweigh the rights of embalmers and funeral directors, when acting outside of their professional capacity, under the First Amendment to the United States Constitution, and, even if the board's interest could outweigh those rights, the regulation was not sufficiently narrow to achieve that end; therefore, this court vacated the board's decision permanently revoking the petitioner's licenses for violating the regulation. [612-619]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 20, 2010.

The case was reported by *Gants,* J.

*Jason Benzaken* for the petitioner.

*Sookyoung Shin,* Assistant Attorney General, for the respondent.

DUFFLY, J. After an adjudicatory hearing, the Board of Registration of Funeral Directors and Embalmers (board) issued an order permanently revoking Troy J. Schoeller's licenses to do business in the Commonwealth as a funeral director and embalmer. G. L. c. 112, §§ 61, 84. The disciplinary action arose after Schoeller made comments to a newspaper reporter about

his experiences in the embalming profession and those comments were later published as part of an article about Schoeller. Schoeller did not reveal any confidential or private information about any deceased person or bereaved family members whom he had served. Rather, the board found that Schoeller had violated an ethical regulation prohibiting an embalmer from "comment-[ing] on the condition of any dead human body entrusted to his or her care," 239 Code Mass. Regs. § 3.13(7) (1998),[1] and that he had used unprofessional language in his descriptions of dead bodies. By doing so, the board concluded, Schoeller had "engaged in gross misconduct and unprofessional conduct which undermines the integrity of the profession." Schoeller filed a petition in the county court, pursuant to G. L. c. 112, § 64, seeking review of the board's order. The single justice reserved and reported the case without decision.

Schoeller generally raises the same claims on appeal as he did before the board. He contends that 239 Code Mass. Regs. § 3.13(7) cannot be a valid basis for discipline because it is unconstitutionally vague and overbroad, and impermissibly abridges his freedom of speech in violation of both the United States Constitution and the Massachusetts Declaration of Rights. He argues also that the board's decision was arbitrary and capricious, an abuse of discretion, and not supported by substantial evidence. Even if there were grounds for discipline, Schoeller contends, the permanent revocation of his license is grossly disproportionate to the alleged misconduct, in violation of his right to due process.

After considering Schoeller's constitutional claims, the board concluded that the regulation "is reasonably related to the [b]oard's interest in protecting the public welfare, which includes preserving the integrity of the funeral services profession, by disciplining funeral service professionals who speak in an undignified and salacious manner about the condition of dead bodies." The board argues before us that the regulation, as con-

---

[1]During the pendency of this appeal, the Board of Registration of Funeral Directors and Embalmers (board) amended its "Code of Conduct and Professional Ethics," 239 Code Mass. Regs. § 3.13 (2012). The amended regulation altered and renumbered several of the clauses involved in this case, but the pertinent provisions remain intact.

strued by the board, reaches only a narrow category of speech that the board has a substantial and legitimate interest in regulating.

We conclude that, even under the board's limited construction, a regulation prohibiting "unprofessional" or "undignified and salacious" comments is overbroad, and therefore unconstitutional, because it restricts a substantial amount of protected speech. As such, 239 Code Mass. Regs. § 3.13(7) is not a valid basis for the board's disciplinary action against Schoeller. We conclude also that the board's asserted interest in maintaining the integrity of the funeral services profession is insufficient to justify the type of restriction on speech at issue here.

1. *Background.* Schoeller has been licensed in Massachusetts as an embalmer since 1999, and as a funeral director since 2004. He was also licensed as an embalmer in Florida for several years before moving to the Commonwealth. Schoeller has no prior history of discipline with the board or in Florida.

The conduct at issue here occurred in late 2006, when a newspaper reporter sought to interview Schoeller about a retail clothing store Schoeller had opened in the Allston section of Boston. Schoeller agreed to the request and met with the reporter in his store on December 6, 2006. The initial interview was conducted in a formal question-and-answer format. After the interview, the reporter invited Schoeller to dinner to continue their conversation. Schoeller accepted the invitation and, along with his wife, joined the reporter at a local restaurant the following evening. The conversation at the restaurant was friendly and informal. Schoeller understood that the purpose of the meeting was "to further the interview about [his] store."[2] Among the topics discussed that evening was Schoeller's work as an embalmer, and Schoeller made statements describing certain of his experiences. Approximately one week later, the newspaper published an article about Schoeller that included his comments about embalming.

The board based its disciplinary action on three passages in

___

[2]The reporter used an audio recording device to record the discussion at the restaurant. Schoeller testified that he thought that the device was a cellular telephone and was unaware until the end of the meal that he was being recorded. The board appears to have credited this testimony in its discussion of mitigating circumstances, but concluded that, nevertheless, "licensees [shall] conduct themselves in a manner that reflects well on the profession."

the article. In the first, Schoeller describes rebuilding the body of an infant who had been involved in a traumatic accident:

> " 'The medical examiner cut all the bones out of this infant . . . ,' Schoeller recalls, 'and they did a calvarian, which means they cut the top of your head off and take out your brain. So I had a baby that looked like a bear skin rug. I had to rebuild it in nine hours. I used everything: duct tape, masking tape, tissue builder, wound filler. I worked for nine and a half hours. . . . I put, like, coat hangers and caulk in there and put him into a little baby outfit. He even weighed enough too, because I packed his head and his chest. He looked awesome.' "

The second passage contains a comment by Schoeller about embalming obese persons:

> "Looking over the menu . . . before his wife arrives, Schoeller says he can't order the chicken satay here because when he got it last time, the skewered meat had fat chunks on it. 'I can't eat fat like that,' he says. 'And I really hate embalming fat people, like people who weigh 300 pounds. Because when you cut open a fat person,' he says matter-of-factly, 'butter leaks out. Literally, yellow oil leaks out of the wound and floats on top of the water. If you put butter in the microwave and put it in the water, it turns into little balls — fat globules — and that's what comes out of fat dead people. It's so nasty.' "

The third passage contains a comment by Schoeller about inhaling gases released by decomposing bodies:

> "On the walk home to the couple's . . . apartment, Schoeller thinks of something else to tell me. 'Here's something my friends find amusing. Decomposing bodies give off methane. What your body does with methane, it puts it all in the same place, which is your bowels. So you actually fart out dead people rot and it smells like the guy you were working on today. I'll go home and I'll fart and [my wife] will be like, "Oh my God," and I'll be like, "That was Mr. Rosenberg." ' "[3]

---

[3]Schoeller testified that his reference to "Mr. Rosenberg" was "a completely

After seeing Schoeller's statements in the article, the chapel that employed Schoeller as an embalmer terminated his employment and filed a complaint with the board. The board commenced an investigation, then issued an order requiring Schoeller to "show cause why the [board] should not suspend, revoke or otherwise take action against [his] license."[4] The board alleged that Schoeller's statements in the article were "comment[s] on the condition of dead human bodies entrusted to [his] care," in violation of 239 Code Mass. Regs. § 3.13(7) (§ 3.13[7]),[5] and constituted "gross immorality" and unprofessional conduct that undermined the public confidence in the integrity of the funeral services profession.[6]

---

fictitious name that [he] had made up on the spot." As noted, there is no claim that Schoeller's statements revealed the identity of a deceased person or otherwise disclosed any confidential or private information. See note 6, *infra*.

[4]An order to show cause consists of a statement of allegations promulgated by a licensing board. Consistent with the requirements of due process, it provides a licensee with notice of the allegations against him and an opportunity to be heard in his defense. See *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 376-377 (1985).

[5]The version of 239 Code Mass. Regs. § 3.13(7) (1998) (§ 3.13[7]) in effect at the time of the board's final order provided, in its entirety:

> "A person who is registered with the Board, or who holds an ownership interest in or is employed by any funeral establishment licensed by the Board, shall not disclose confidential or private information about any member of any household or family which he or she serves, or comment on the condition of any dead human body entrusted to his or her care."

The amended version of the regulation, see note 1, *supra*, contains several additional clauses, such as a prohibition against "engag[ing] in any other conduct adverse to the interests of that client based on information obtained in confidence." The amended regulation also provides that "[n]otwithstanding 239 [Code Mass. Regs. §] 3.13(1) through (6), 239 [Code Mass. Regs. §] 3.13(7) shall not be interpreted to bar cooperation with a board investigation or from making other disclosures as required by law or for purposes of insurance and debt collection activities." 239 Code Mass. Regs. § 3.13(7) (2012). None of these changes is pertinent to our decision.

[6]Initially, the board also alleged that Schoeller had disclosed confidential information and breached the confidence of a client. The parties agreed at a preliminary conference, however, that Schoeller's statements had revealed no confidential information, and those allegations were dismissed. The board also amended its order to show cause to consider whether Schoeller had provided false information on an application to renew his license, but ultimately found no such violation.

610                                463 Mass. 605 (2012)

Schoeller *v.* Board of Registration of Funeral Directors and Embalmers.

Schoeller did not dispute that he had made the statements attributed to him, but denied that those statements violated any statute, regulation, or rule. He asserted that his statements were factually accurate and thus protected under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution. He argued that his comments therefore could not be the basis of any disciplinary action. Schoeller also moved to dismiss the order on the grounds that the board's regulations were unconstitutionally vague and overbroad, in violation of his rights to free speech and due process of law.

The board denied Schoeller's motion and held an evidentiary hearing on December 2, 2009. At the hearing, the board presented numerous exhibits and the testimony of two witnesses. John W. Bresnahan, the board's investigator, testified as an expert on the professional standards of the funeral services industry in Massachusetts. Bresnahan testified that Schoeller's comments did not conform to professional standards of conduct because Schoeller had commented on the condition of a dead human body entrusted to his care, in violation of § 3.13(7). When asked to expand on this opinion, Bresnahan asserted that the regulation "calls for appropriate care to the deceased," which includes not using any "unprofessional language." Bresnahan said that Schoeller's comments amounted to "gross misconduct" because he had violated § 3.13(7) and had used unprofessional language in discussing the embalming of deceased persons.

During cross-examination, Bresnahan acknowledged that he was not aware of any embalmer or funeral director who had been disciplined for commenting on the condition of a deceased person. He also testified that embalmers often discuss the condition of dead bodies in the course of their training and education and in trade journals and other professional publications. When asked to clarify whether § 3.13(7) prohibits an embalmer from ever commenting on the condition of a dead body, or whether it only prohibits doing so with unprofessional language, Bresnahan testified that, in his opinion, the regulation requires embalmers to use "appropriate, professional language" when commenting about a dead body.

The board found that Schoeller had violated § 3.13(7) and "the [o]ath of the [b]oard."[7] The board found also that Schoeller's comments amounted to gross misconduct in violation of G. L. c. 112, § 61, and unprofessional conduct that undermined the integrity of the profession. The board determined that Schoeller's statements "reflect a cavalier and even callous attitude toward dead bodies," and voted unanimously to revoke Schoeller's licenses without the possibility of renewal.

2. *Discussion.* General Laws c. 112, § 64, "provides that a person whose [professional license] has been suspended or revoked may petition this court to 'enter a decree revising or reversing the decision of the board, in accordance with the standards for review provided' in G. L. c. 30A, § 14 (7)." *Fisch v. Board of Registration in Med.,* 437 Mass. 128, 131 (2002). Accordingly, we will modify or set aside the board's decision only if Schoeller demonstrates that the decision was in violation of a constitutional provision; legally erroneous; unsupported by substantial evidence; arbitrary or capricious; or an abuse of discretion. G. L. c. 30A, § 14(7). See *Weinberg* v. *Board of Registration in Med.,* 443 Mass. 679, 685 (2005).

Schoeller's principal argument before us is that § 3.13(7) is facially unconstitutional because it is both vague and overbroad. He maintains that the regulation is impermissibly vague because the board's newly asserted "professional language" rule is not set forth or defined in the board's written regulations and it therefore invites discriminatory enforcement. He contends also that § 3.13(7) is overbroad because the regulation prohibits constitutionally protected speech.

Vagueness and overbreadth are related concepts, but implicate distinct constitutional rights. The vagueness doctrine is a function of due process, which requires that a law provide fair notice of what it prohibits or requires so that persons of common intelligence may conform their conduct to the law. See *United States* v. *Williams,* 553 U.S. 285, 304 (2008). Over-

---

[7]Upon receiving his licenses, Schoeller took an oath required by the board of all new licensees. In pertinent part, he swore "not to . . . comment on the peculiarities or conditions of any dead human bodies entrusted to [his] care." Because this provision is substantively identical to § 3.13(7), we address Schoeller's argument in the context of the regulation. We note, however, that our reasoning applies with equal force to the oath.

breadth, on the other hand, relates to protections provided by the First Amendment; a law may be declared overbroad, and thus unconstitutional, if it prohibits a substantial amount of constitutionally protected speech. See *Commonwealth* v. *Ora*, 451 Mass. 125, 128 (2008). Where a litigant challenges a law as both facially vague and overbroad, we consider the overbreadth claim first. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). We will reach the vagueness claim only if we conclude that the regulation does not prohibit a substantial amount of protected speech. See *id.*

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611-612 (1973). To ensure this breathing space, the overbreadth doctrine permits facial challenges to statutes or regulations that, although susceptible of some valid applications, are alleged to prohibit or chill constitutionally protected expression.[8] See *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth*, 460 Mass. 647, 676 (2011), cert. denied, 132 S. Ct. 2377 (2012). Declaring a statute or regulation overbroad, however, is "strong medicine," to be employed "sparingly and only as a last resort." *Broadrick* v. *Oklahoma, supra* at 613. Application of the doctrine is therefore limited "to instances where a law 'prohibits a substantial amount of protected speech.' " *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth, supra* at 677, quoting *United States* v. *Williams, supra* at 292.

The first step in examining whether a statute or regulation reaches too far is to identify the conduct or speech that it prohibits. *United States* v. *Williams, supra* at 293. The board does not appear to dispute that § 3.13(7), prohibiting embalmers from "comment[ing] on the condition of any dead human body

---

[8]Thus, overbreadth is an exception to traditional rules of standing that permit litigants to assert their own rights but not the rights of others. See *Commonwealth* v. *Ora*, 451 Mass. 125, 128-129 (2008). The board does not contest Schoeller's standing to make an overbreadth claim, but does raise standing as a bar to his vagueness claim. Because we do not reach Schoeller's vagueness argument, we do not address the board's position.

entrusted to [their] care," would be overbroad and thus constitutionally deficient if read literally, without regard to the context in which the comment occurs. Bresnahan testified that discussing the condition of dead bodies is part of an embalmer's education and training; an instructor may need to use specific examples in the course of teaching, and it would be difficult for a student to learn a specialized trade without being able to discuss an essential component of the profession.

If interpreted literally, the regulation would not only prohibit funeral directors and embalmers from discussing an essential component of their profession in the course of their personal lives, but would also prevent *any* comment about a deceased's condition to bereaved family members or to authorities to whom embalmers and funeral directors are required to report.[9] See, e.g., 239 Code Mass. Regs. § 3.08(1) (2012) (requiring embalmers and funeral directors to report to medical examiner "all deaths believed to have been caused by injury or trauma"). The board has construed § 3.13(7) more narrowly; it submits that the regulation prohibits only the use of "unprofessional language," which it defines as comments made "in an undignified and salacious manner about the condition of dead bodies." As construed by the board, § 3.13(7) prohibits an embalmer or funeral director from making any undignified comments about dead human bodies that have ever been entrusted to his or her care, including when made in a private capacity and not as a professional and when the speech is uttered outside of the presence of the deceased or the bereaved.

We must next determine whether § 3.13(7), even as limited by the board's narrower construction, nonetheless prohibits a "substantial amount" of protected speech.[10] *United States* v. *Williams, supra* at 297. "Substantial overbreadth demands a

---

[9]Such a reading also would be inconsistent with the Funeral Ethics Association's "Manual of Professional Practice," which is cited in the board's brief and included in the administrative record. That publication sets forth model guidelines of "Undertaking Ethics" and provides, in a section entitled "Responsibility to the Press and Public," that "Funeral Directors should be available to discuss with anyone all matters relative to the conduct of a funeral. Whenever possible, the funeral director should assume active leadership in seminars or discussion which will bring a deeper understanding to all concerned about death, the funeral and bereavement."

[10]Although we generally defer to an agency's interpretation of its own

'realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections of parties not before the Court.' " *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth*, *supra* at 677, quoting *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 800-802 (1984).

We have never directly considered the extent to which the speech of professionals subject to regulation under G. L. c. 112 may be regulated consistent with the United States Constitution. We have recognized, in the context of discipline of physicians, that "conduct that undermines public confidence in the integrity of the [medical] profession, is reasonably related to promotion of public health, welfare, and safety," and, therefore, the Board of Registration in Medicine has broad authority to regulate and sanction such conduct. *Raymond* v. *Board of Registration in Med,.* 387 Mass. 708, 713 (1982). Moreover, we have stated that, because licensed professionals are subject to regulation, they do not come before us as citizens "entitled to the full range of individual rights available to all citizens." *Weinberg* v. *Board of Registration in Med.*, 447 Mass. 678, 689 (2005). However, we have not previously addressed the extent to which those individual rights may be limited, see, e.g., *id.* at 690 (due process, privacy, and First Amendment claims deemed waived); *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 347 (1996) (First Amendment claim), and have found no cases that have considered the precise question before us.

Most analogous to the present circumstances are cases involving attorney discipline. As in the case of physicians, attorneys may be subject to restrictions on rights "to which an ordinary citizen would not be," *Matter of Cobb*, 445 Mass. 452, 467-468 (2005), quoting *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030,

regulations, see *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976), the board's position in this case is not an attempt to interpret the terms of § 3.13(7). Rather, it has endeavored to rewrite the regulation's scope without regard to the regulation's plain terms in an attempt to avoid constitutional infirmity. While we owe no deference to the board's view in these circumstances, see *id.*, we nevertheless consider the board's limiting construction because it appears to reflect the policy that the board intends to apply in the future, and because the board relied on this limited view in finding that Schoeller's comments amounted to gross misconduct and conduct undermining the integrity of the profession.

1071 (1991), and some of those restrictions may relate to speech. See *In re Snyder*, 472 U.S. 634, 644 (1985) (restricting attorney's freedom of speech in certain instances "reflects the burdens inherent in the attorney's dual obligations to clients and to the system of justice"). We have said that such restrictions on attorney speech are appropriate because of the attorney's unique role as an "intimate and trusted and essential part of the machinery of justice, an 'officer of the court' in the most compelling sense." *Matter of Cobb*, *supra* at 468, quoting *Gentile* v. *State Bar of Nev.*, *supra* at 1072.

The extent to which attorney speech may be restricted is largely dependent on the context in which an attorney speaks. An attorney's comments may not enjoy the full range of First Amendment protections when he or she is "actively participating in a trial," but the attorney nonetheless retains the "constitutional freedom of utterance and may exercise it" fully when not acting as an "officer of the court." *Matter of Cobb*, *supra*, quoting *Gentile* v. *State Bar of Nev.*, *supra*. Thus, speech that permissibly subjects an attorney to discipline falls generally into two categories: (1) speech made during the conduct of a court room proceeding, see *Gentile* v. *State Bar of Nev.*, *supra*, and (2) speech outside of a court room that creates a "substantial likelihood of material prejudice" to a pending adjudicatory proceeding. *Id.* at 1075.

In the context of these two categories, when an attorney is representing a client in a pending case, the attorney's speech is regulated under a less demanding standard than that ordinarily applied to First Amendment speech rights. See *Matter of Cobb*, *supra*. Where an attorney has spoken outside the context of an adjudicatory proceeding, however, the standard under which the attorney may be disciplined is more demanding than if the attorney were involved in direct representation, and requires a showing that the speech has created a "substantial likelihood of material prejudice" in a pending adjudicatory proceeding. *Gentile* v. *State Bar of Nev.*, *supra* at 1075. See *In re Sawyer*, 360 U.S. 622, 636 (1959). Thus, whether an attorney's speech outside the court room is subject to discipline will depend on the content of the speech and the context in which it occurs; any limitation on an attorney's speech must be narrow and directed at comments

616                                     463 Mass. 605 (2012)

Schoeller *v.* Board of Registration of Funeral Directors and Embalmers.

likely to influence the trial or judicial determination. *Gentile* v. *State Bar of Nev., supra.*

While the analogy is imperfect, the regulation governing the speech of funeral services professionals, like regulations governing that of attorneys, seeks to restrict speech both when embalmers and funeral directors are acting directly in the performance of their professional capacities and when they are not providing funeral services and are not speaking in the presence of the deceased or bereaved. The board found that Schoeller's speech, which occurred while he was not rendering professional services, violated § 3.13(7) and "constituted misconduct that undermined the integrity of the profession." Whether the board may permissibly regulate speech in this context — where the speaker is not acting in his or her professional capacity — turns on whether the restriction is narrowly drawn and whether the board's interest is sufficient to require that the First Amendment interests at stake must "give way to other compelling needs of society." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611-612 (1973).

Here, the board has proposed that the compelling societal need to which speech rights must give way is the integrity of the funeral services profession. However, the board's power to regulate derives from the Legislature, and any regulation that seeks to protect the integrity of the profession must be grounded in or tethered to a legislative purpose that the board is charged with carrying out.[11] Looking to the statutory framework for regulating the funeral services profession, we discern three general interests that the Legislature sought to protect: (1) the health, welfare, and safety of the public, see, e.g., G. L. c. 112,

---

[11]We do not mean to suggest that the Legislature must specifically identify integrity of the profession as a legislative goal before a board or agency may adopt a regulation designed to protect it. Licensing boards have broad authority in this area, and their view of the integrity of the profession need only be "reasonably related" to the legislative purpose. *Raymond* v. *Board of Registration in Med.*, 387 Mass. 708, 711 (1982). Thus, for example, we do not question the board's authority to prohibit an embalmer from disclosing confidential information. See 239 Code Mass. Regs. § 3.13(7) (2012). Cf. *Sugarman* v. *Board of Registration in Med.*, 422 Mass. 338, 343 (1996) (medical board permitted to conclude that disclosure of confidential information undermined integrity of profession). The integrity of a licensed profession is not, however, a limitless concept that can be invoked without regard to the statutory scheme in which a licensing board operates.

§ 83 (requiring familiarity with precautions necessary to prevent spread of communicable diseases; conversance with laws for sanitary handling of dead human bodies; and proof that applicant will maintain establishment at fixed location, constructed and equipped so as to permit sanitary handling of dead human bodies); (2) honesty and fairness in business dealings with those seeking funeral services, see, e.g., G. L. c. 112, § 84 (*a*) and (*b*) (permitting suspension or revocation of license for misrepresentation or fraud in conduct of profession and for false or misleading advertising); and (3) the treatment of dead human bodies with dignity and the bereaved with respect, see G. L. c. 112, § 84 (*g*) (permitting suspension or revocation of license for use of "profane, indecent or obscene language in the presence of a dead human body, or within the immediate hearing of the family or relatives of a deceased, whose body has not yet been interred or otherwise disposed of").

Relevant here is the Commonwealth's interest in the treatment of the deceased with dignity. As noted, the Legislature has provided that embalmers and funeral directors may be required to abstain from using "profane, indecent or obscene language" while acting in a professional capacity, see *id.*, and we agree that violation of such a restriction on speech could undermine the integrity of the funeral services profession. We have recognized in other contexts that there is a "special sensitivity" required in the processing and handling of a deceased human body, *Kelly* v. *Brigham & Women's Hosp.*, 51 Mass. App. Ct. 297, 308 (2001), quoting *Jobin* v. *McQuillen*, 158 Vt. 322, 328 (1992), and that funeral services "are always rendered and most often contracted for under emotional circumstances." *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing*, 379 Mass. 368, 374 (1979).

The board proposes that these interests require the broadening of limitations on the speech of embalmers and funeral directors to include comments made outside of funeral homes, and would extend the prohibition to comments made by embalmers and funeral directors in any context. The board suggests that, in order to maintain public confidence in the profession, as that interest has been defined by the Legislature, § 3.13(7) permissibly may be construed to proscribe any undignified comments

by embalmers and funeral directors about any dead bodies that have ever been entrusted to their care. As we have described, however, regulations that attempt to limit the speech of licensed professionals when acting outside of their professional capacity must be narrow, and applied with precision to the type of speech that the board has a legitimate interest in regulating. Cf. *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1075 (1995). Further, the board's asserted interest must be balanced against the First Amendment rights at stake.

Under this standard, we conclude that the board's generalized interest in maintaining the integrity of the profession cannot outweigh the First Amendment rights of embalmers and funeral directors when acting outside of their professional capacity; and, even if the board's interest could outweigh those First Amendment rights, § 3.13(7) is not sufficiently narrow to achieve that end.[12] The record contains numerous examples of circumstances in which the board's regulation could reach constitutionally protected speech and potentially expose embalmers and funeral directors to discipline given the board's prohibition of "unprofessional" or "undignified" comments. Among these examples are articles in professional publications in which the authors, who are funeral service professionals, comment on the condition of deceased bodies in graphic terms that some might subjectively view as undignified.[13]

Under the board's reading of § 3.13(7), such statements could

---

[12]We do not foreclose the possibility that the board may regulate the speech of embalmers and funeral directors, even when acting outside of their professional capacity, in a constitutionally permissible manner. To do so, however, the board would need to identify with precision a more specific and compelling interest than a vague, generalized notion of integrity in the funeral services profession, and promulgate a regulation narrowly tailored to achieve that end.

[13]One such article describes in detail the "skin slip" that occurred as a consequence of bodies having been exposed to high heat in the fire that caused their deaths. Collison, Victims of Fire: The Problems Caused by 1st and 2nd Degree Burns, Dodge Mag., Winter 2007, at 6. In another article, an embalmer described as coming from Massachusetts offers a "Tech Tip": "A dull [instrument] will prevent the cavity chemical from getting into [hollow organs] to do its job, and that may cause gas buildup." Murphy, Tech Tip from Your Dodge Rep, Dodge Mag., Winter 2007, at 7. Other articles detail the reconstruction of disfigured corpses, including a description of the swollen and distorted appearance of a body that had been shipped from overseas. The condition of the body "wasn't good. . . . Some facial tissue was beginning to

potentially subject the authors to discipline if they were licensed in Massachusetts. Like these authors, Schoeller did not identify a particular deceased person or reveal confidential information about any decedent's family. His comments described in detail the process of embalming the dead, an area recognized by the profession as one about which the public knows little and should be more informed. See note 9, *supra*. Although Schoeller spoke colloquially, using both graphic and crude terms in his descriptions of the challenges he faced as an embalmer, his comments convey that he took apparent pride in his skills.

In summary, while there may be circumstances in which the board can appropriately seek to limit the speech rights of licensed funeral directors and embalmers, see note 12, *supra*, in proscribing all "undignified" comments, the board has "traveled in the constitutionally unacceptable direction," *Mendoza* v. *Licensing Bd. of Fall River*, 444 Mass. 188, 201 (2005), of banning a substantial amount of protected speech. The board cannot apply § 3.13(7) to restrict such a wide range of speech, nor may it limit that speech by relying on a generalized notion of the integrity of the funeral services profession.[14]

3. *Conclusion.* The case is remanded to the county court where an order shall enter allowing Schoeller's petition and vacating the decision of the Board of Registration of Funeral Directors and Embalmers.

*So ordered.*

---

separate from early stages of decomposition." Adams, The Polish Businessman, Dodge Mag., Winter 2007, at 4. One article is devoted to the difficulties of reconstructing the face of a teenage boy that had become distorted by a large tumor; the author wrote, "This distortion was (and probably still is) one of the most grotesque things I've ever seen in my life." Adams, Please Take That Thing Off My Son's Face: Part 2, Dodge Mag., June 2001, at 4. The author described the "tissues throughout the body" as "spongy and breaking down from the effects of drug treatment," and proposed a procedure he had found useful in the circumstances to get "better control of the head." *Id.* at 4, 5.

[14]Because we conclude as we do, we need not address Schoeller's remaining claims.